## SCHOONER PAULINA'S CARGO

1812.

v.

Feb. 15th.

## THE UNITED STATES.

*Absent....Washington, justice.*

The 3d section of the act of congress of the 9th of January, 1808, which prohibited the trans-ship-ment of goods from one ves-sel to another, did not include the case of a vessel lading in port by means of river craft, &c. The 2d sect. of the act of congress of the 25th of April, 1808, did not require a per-mit to lade any vessel, nor au-thorize the forfeiture and condemnation of the vessel or cargo, for lad-

ERROR to the Circuit Court for the district of Rhode Island.

The schooner *Paulina* and cargo were seized and li-belled by the collector of the port of Newport, alleging that the cargo was laden on board, within the district of Newport, between the 1st of June and the last of July in the year 1808, in the night season, *without a permit from the collector, and without the inspection of the proper revenue officers,* and contrary to the 2d section of the "act of Congress, entitled *" An act in addition to the " act entitled an act laying an embargo on all ships and " vessels in the ports and harbors of the United States, and " the several acts supplementary thereto, and for other pur-" poses,"* passed the *25th of April,* 1808; and contrary to the 50th section of the *act to regulate the collection of duties, &c.* passed the *2d of March,* 1799. In the District Court the vessel and cargo were both ordered to be restored.

Upon the appeal in the Circuit Court, the Libellant had leave to amend his libel, by stating that on the wa-

ters of Warwick bay, in the district of Rhode Island, at a place called the *Fulling Mill* in Warwick, and about 120 fathoms from the landing, at sundry times, between the 1st of June and the last of July in the year 1808, the articles constituting the cargo of the Paulina, were trans-shiped from a small sloop called the *May-flower* into the schooner *Paulina*, without the intervention of any other water craft, or of any intermediate landing, with intent to be transported without the United States, contrary to the 3d section of the act of Congress, entitled " *An act supplementary to the act entitled an act laying an embargo on all ships and vessels in the ports and harbors of the United States,*" passed on the 9th of January, 1808, whereby the said cargo is forfeited, &c.

*SCHOONER PAULINA'S CARGO v. U. STATES.*

*──ing without the inspection of a revenue officer; the only penalty for such lading being the denial of a clearance*

The words of the 2d section of the act of 25th of April, 1808, *vol.* 9, *p.* 146, are " That during the continuance of the act " laying an embargo on all ships and vessels in the " ports and harbors of the United States, and of the several " acts supplementary thereto, no ship or vessel of any " description whatever, other than those described in " the next preceding section, and wherever bound, shall " receive a clearance, unless the lading shall be made " hereafter under the inspection of the proper revenue " officers, subject to the same restrictions, regulations, " penalties and forfeitures, as are provided by law for " the inspection of goods, wares and merchandize im- " ported into the United States, upon which duties are " imposed, any law *to the* contrary notwithstanding."

By the 50th section of the act of 2d of March, 1799, *vol.* 4, *p.* 360, to regulate the collection of duties, &c. it is enacted " that no goods, wares or merchandize, " brought in any ship or vessel from any foreign port " or place, shall be unladen or delivered from such ship " or vessel, within the United States, but in open day, " that is to say, between the rising and setting of the " sun, except by special license from the collector of " the port, and naval officer of the same, (where there " is one) for that purpose, nor at any time without a " permit from the collector, and naval officer, (if any) " for such unlading or delivery; and if any goods, " wares or merchandize shall be unladen or delivered " from any such ship or vessel, contrary to the direc- " tions aforesaid, or any of them, the master" &c.

"shall forfeit and pay, each and severally, the sum of "400 dollars for each offence, and shall be disabled "from holding any office of trust or profit for a term "not exceeding seven years," "and all goods, wares "or merchandize, so unladen or delivered, shall become "forfeited, and may be seized by any of the officers of "the customs;" and if the value shall exceed 400 dollars, the vessel, &c. shall be subject to like forfeiture and seizure.

By the 3d section of the act of the 9th of January, 1808, (vol. 9, p. 11) it is enacted, "That if any ship or "vessel shall, during the continuance of the act to which "this is a supplement, depart from any port of the "United States without a clearance or permit, or if any "ship or vessel shall, contrary to the provisions of this "act or of the act to which this is a supplement, pro-"ceed to a foreign port or place, or trade with *or put* "*on board of any other ship or vessel, any goods, wares* "*or merchandize,* of foreign or domestic growth or "manufacture, such ships or vessels, *goods, wares and* "*merchandize, shall be wholly forfeited;*" "and the mas-"ter or commander of such ship or vessel, as well as "all other persons who shall knowingly be concerned "in *such prohibited foreign voyage,* shall each respective-"ly forfeit and pay a sum not exceeding 20,000 dol-"lars," &c.

The Circuit Court *affirmed* the sentence of the District Court so far as it decreed the restitution of the *vessel,* but *reversed* it so far as it decreed restitution of the *cargo,* which the Circuit Court condemned.

To reverse this sentence of condemnation the present writ of error was sued out by Simeon Jones, the owner and Claimant of the vessel and cargo.

On the 20th of February, 1810, a *dedimus* was issued from the Supreme Court to take depositions in Rhode Island, which was executed and returned on the 14th of March.

The material facts appearing upon these depositions were that the former owners of the Paulina, being prevented by the embargo from using their vessel, in order

to save expence, took her into Warwick bay, which was near the residence of one of the owners. Shortly afterwards they sold her to the present Claimant, Jones, who caused her to be publicly, and in open day, laden by means of the sloop May-flower, which was a little vessel of 15 tons burthen, whose usual business it was to carry goods from Providence to Warwick and East Greenwich. That he thus caused her to be laden in the expectation that the embargo would be very shortly taken off. There was also some evidence tending to excite suspicion that the intention was to evade the embargo.

*SCHOONER PAULINA'S CARGO v. U. STATES.*

PITKIN, *for the Plaintiff in Error.*

Neither this vessel nor cargo were liable to forfeiture under either of the laws mentioned in the libel.

1. As to the 2d section of the act of the 25th of April, 1808, *(vol. 9, p. 146.)* It has been uniformly decided in all the Circuit Courts, that this section does not impose a forfeiture of either the vessel or cargo. In the present case Judge Cushing condemned the cargo, nor under this section, but under the 3d section of the act of the 9th of January, 1808, which prohibits the transhipment. The only penalty for lading the vessel without the inspection of a revenue officer, is the refusal of a clearance. The 2d section of the act of the 25th of April does not refer to the 50th section of the collection law, but to the 53d, 54th and 55th sections, which apply to the duties of inspectors, and provide for their due execution by penalties, but they contain no regulation whereby either the vessel or cargo can be forfeited. The construction contended for by the government is contrary to the spirit of the embargo system. Nothing had been before said respecting the lading of a vessel. She might lade as she pleased, and might go to sea upon giving bond, &c. This act is the first which regulates the lading.

The object of the embargo was to prevent foreign voyages. The provision that the lading should be under the inspection of a revenue officer, was intended to enable the collector to judge from the nature of the cargo whether it was intended for a foreign voyage: and

SCHOONER
PAULINA's
CARGO
v.
U.STATES.

if he should be of that opinion, he was, by the same law, authorised to detain the vessel until the pleasure of the President should be known. The object of the legislature was completely answered by denying a clearance, and thereby preventing the vessel from going to sea, in case she had taken in her lading without the inspection of a revenue officer. It was not intended to prevent the owner from using his vessel as a store-house without a permit, or from putting goods on board without the inspection of an officer.

That this was the understanding of the legislature upon the subject is evident from the act of the 9th of January, 1809, usually called the *enforcing act,* the 2d section of which *(vol. 9, p. 186)* requires a permit, and prohibits the lading of any vessel without one, and without the inspection of a revenue officer, all which would have been necessary if the law was the same before.

2. As to the 3d section of the act of the 9th of January, 1808, *(vol. 9, p. 11)* the supposed violation of which is, by the amendment of the libel, made a ground for the claim of condemnation of the cargo, it does not apply to a lading or trans-shipment *in port.*

The objects of this law were three:

1. To prevent a vessel from departing without a clearance.

2. To prevent her, after having obtained a clearance, from going to a foreign port; and

3. To prevent her, after clearance, from taking in goods at sea.

It does not contemplate an act done in port. The expression *" such prohibited foreign voyage,"* shews that the legislature were contemplating foreign voyages only, and not merely the lading of a vessel in port. There were many ports in which a vessel could not be laden but by the intervention of lighters. It cannot be supposed that the legislature meant to prohibit all lading at those ports. The act of 25th of April has an express exception in favor of all vessels then laden, without re-

gard to the manner of their lading; so also has the act of the 9th of January, 1809.

. DALLAS, *Attorney of the United States for the District of Pennsylvania, contra.*

Penal laws are to be construed according to their plain intent. No construction ought to be given which would defeat the object of the law.

1. As to the claim of forfeiture under the 2d section of the act of the 25th of April, 1808, and the 50th section of the collection law.

Let us consider what was the previous law—the mischief intended to be remedied; and the remedy intended to be applied.

1. As to the previous law. The first embargo law, of the 22d of December, 1807, *(vol. 9, p. 7)* required bonds from registered and sea-letter vessels only, conditioned to reland their cargoes in the United States.

The second embargo law, of January 9th, 1808, *(vol. 9, p. 10)* required vessels, licensed for the coasting trade, to give a similar bond; and those licensed for the *fisheries*, or whose employment had been uniformly confined to *rivers*, *bays* and *sounds*, were to give a *general* bond. It also forfeited the vessel and cargo if she departed without a clearance or permit, or proceeded to a foreign place, or traded with, or put goods on board any other vessel, or if (being a foreign ship) she took in a cargo.

2. The mischief intended to be remedied, was, that there was no provision for compelling vessels which were confined to bays, &c. to take a clearance, and give a manifest of their cargoes, and to produce a certificate of relanding them in the United States. Nor any provision for inspecting the lading of vessels.

3. The remedy provided by the legislature was, to prohibit all bay craft, &c. from departing from a district without having obtained a clearance, and deliver-

ing a manifest of their cargoes; and to require a cer-
tificate of the relanding of the cargo within the bay, &c.

And to prohibit all other vessels from receiving a
clearance, unless the lading should be made under the
inspection of the proper revenue officers, *subject to the
same restrictions, regulations, penalties and forfeitures, as
are provided by law for the inspection of goods, wares
and merchandize, imported into the United States, upon
which duties are imposed.*

We are thus referred expressly, in a case of *lading
for exportation,* to the rule of a case of *importing to un-
lade.*

There is no case of inspection of lading, but for the
benefit of drawback, which is a case of *ex*-portation and
not *im*-portation, and is therefore out of the reference.
The penalties and forfeitures apply to a relanding, or
to not producing a certificate of relanding, and not to
the lading.

We are therefore to adopt the restrictions, regula-
tions, penalties and forfeitures of the import law, *mu-
tatis amutandis.*

Under *that* law, goods must be *un*-laden in the day
time.

Under *this,* they must be *laden* in the day time.

Under *that,* there must be a permit to *un*-lade.

Under *this,* there must be a permit to *lade.*

Under *that,* the *un*-lading must be under the inspec-
tion of a revenue officer.

Under *this,* the *lading* must be under the like inspec-
tion.

Under *that,* goods *un*-laden without permit, are for-
feited.

Under *this,* they are forfeited if *laden* without permit.

If the legislature meant this, it is well; if they did
not, there is no meaning in the sentence; nothing upon
which the reference can operate. That this is the true
construction of the act appears from the provisions
made by the legislature in *pari materia* in the act of the
9th of January, 1809, *vol. 9, p.* 186, where the same
ideas are expressed in different language.

SCHOONER
PAULINA's
CARGO
*v.*
U.STATES.
————————

2. As to the claim of forfeiture under the 3d section
of the act of January 9th, 1808. (*Vol. 9, p.* 10.)

1. *What was the previous law?* 1. An embargo had
been laid on all American vessels, but no penalty was
inflicted. 2. Foreign vessels might sail in ballast and
with the goods then on board. 3. Bonds were to be
given by registered and sea-letter vessels only, not to
violate the embargo.

2. *What was the mischief to be remedied?* 1. Ameri-
can vessels might slip away without clearance or per-
mit. 2. Registered and sea-letter and licensed vessels
might go to foreign places. 3. Or might trade. Or 4.
might put goods on board another vessel.

3. *What was the remedy provided?* 1. That licensed
and fishing vessels should give bond. 2. That no ves-
sel should sail without a clearance or permit. 3. That
no vessel should proceed to a foreign place. 4. That
no ship should trade with another; and 5. That no ves-
sel should trans-ship goods, under the penalty of the
forfeiture of the goods.

The fact is not denied that the Paulina took in her
lading without a permit, and without the inspection of
a revenue officer, and that it was trans-shipped from
the May-flower.

She is then within the letter of the law, and we say
she was also within the spirit and meaning.

The circumstances also show that the intention was
to violate the embargo; and the provisions of the law
were intended to punish that intention when it should
be manifested by certain acts.

SCHOONER     PITKIN, *in reply.*
PAULINA'S
    CARGO        The words of the 2d section of the act of the 25th of
·    *v.*     April are " subject to the same *restrictions,* &c. as are
U.STATES.    provided by law for the. *inspection* of goods imported.
———·———      If we are to be guided by the grammatical construction
             of the sentence, the *revenue officers,* being the last ante-
             cedent, are to be subject to the same restrictions, regu-
             lations, penalties and forfeitures, &c. But if the *lading*
             is to be subject to the restrictions, &c. it is only to be
             subject to the restrictions, &c. respecting the *inspection*
             of goods imported. We are not referred to the law
             respecting the necessity of a *permit.* And there was
             no reason for a permit to *lade.* The permit was evi-
             dence that the duties had been paid or secured, upon
             goods imported. But as there were no duties to be
             paid upon goods exported, no such evidence was re-
             quired, and a permit would have been useless.

              *February 21st, All the judges being present,*

             MARSHALL, CHIEF JUSTICE, delivered the opinion of
             the court as follows:

             The libel in this case, as amended in the Circuit
             Court for the District of Rhode Island, claims the
             schooner Paulina and her cargo as forfeited under the
             3d section of the act supplementary to the act laying
             an embargo, and under the 2d section of the act in ad-
             dition to the original embargo act and its several sup-
             plements, and under the 50th section of the act regu-
             lating the collection of duties on imposts and tonnage.

             In the District Court both vessel and cargo were ac-
             quitted; but in the Circuit Court the cargo was con-
             demned.

             In construing these laws, it has been truly stated to
             be the duty of the court to effect the intention of the
             legislature; but this intention is to be searched for in
             the words which the legislature has employed to con-
             vey it. The legislature has declared its object to be to
             lay an embargo on the vessels of the United States,
             and to prevent the transportation of any article what-
             ever from the United States to any foreign port or

place; and therefore such transportation is prohibited. has prescribed. Those acts become criminal and sub- ject the person to such punishment as the law inflicts. In ascertaining what they are, the court must search for the intent of the legislature, guided by those rules which the wisdom of ages has sanctioned.

But should this court conjecture that some other act, not expressly forbidden, and which is in itself the mere exercise of that power over property which all men possess, might also be a preliminary step to a violation of the law, and ought therefore to be punished for the purpose of effecting the legislative intention, it would certainly transcend its own duties and powers, and would create a rule instead of applying one already made. It is the province of the legislature to declare, in explicit terms, how far the citizen shall be restrain- ed in the exercise of that power over property which ownership gives; and it is the province of the court to apply the rule to the case thus explicitly described— not to some other case which judges may conjecture to be equally dangerous.

The fact made out in the present case is this:

The Paulina, a registered vessel, lying in the common anchorage ground of Warwick bay, in the district of Rhode Island, about two hundred fathoms, from the shore, received her cargo from the May-flower, a small vessel of fifteen tons burthen, accustomed to ply between Providence and Newport. The lading of the Paulina was continued in open day for several weeks, but not under the inspection of a revenue officer. When her cargo was nearly on board, she was seized and li- belled as having violated the acts of Congress which have been mentioned.

The question will, it is conceived, be the more clear- ly understood, if we consider the laws in the order in which they were passed, and inquire, first, whether the 3d section of the supplementary act has been violated.

SCHOONER
PAULINA's
CARGO
*v.*
U. STATES.

In pursuing this inquiry, it is essential to examine how far lading a vessel under the circumstances of the Paulina, was prohibited by the original and supplementary acts without taking into view any subsequent act of Congress.

The original act, passed on the 22d of December, 1807, lays an embargo on all vessels bound to foreign ports, and directs that no clearance be furnished to such vessel. The 2d section directs that before a registered vessel shall receive a clearance for a port in the United States, a bond shall be given with a condition that the cargo shall be relanded in some port of the United States, dangers of the seas excepted.

This act contains no provision applicable to the lading of any vessel whatever, or to licensed vessels, nor does it inflict any forfeiture or penalty on vessels which should depart without a clearance.

The incompetency of this act to effect its object could not be long unobserved. It was soon perceived that foreign trade might be carried on by licensed vessels, and that further regulations respecting registered vessels would also be necessary.

On the 9th of January, 1808, the supplemental act was passed.

The first section directs that bonds shall be given on the part of vessels licensed for the coasting trade, conditioned not to proceed to any foreign port or place, and to reland the cargo in some port of the United States.

The second section contains a proviso declaring that it shall be sufficient for the owners of vessels of the description of the May-flower, to give bond with a condition not to be employed in *any foreign trade.*

This review of the prohibitions contained in the original and supplementary embargo acts, was necessary to a complete understanding of the 3d section of the supplemental act which is the section supposed by the libellants to comprehend the present case

That section is in these words:

"And be it further enacted, That if any ship or vessel shall, during the continuance of the act to which this is a supplement, depart from any port of the United States without a clearance or permit, or if any ship or vessel shall, contrary to the provisions of this act, or of the act to which this act is a supplement, proceed to a foreign port or place, or trade with or put on board of any other ship or vessel any goods, wares or merchandize, of foreign or domestic growth or manufacture, such ships or vessels, goods, wares and merchandize shall be wholly forfeited," &c.

This section contemplates three distinct transactions.

1. A departure from any port of the United States without a clearance or permit.

2. Contrary to the provisions of the original or supplementary acts to proceed to a foreign port or place; or,

3. To trade with, or put on board any other ship or vessel any goods, wares or merchandize.

The offence last described is supposed to have been committed by the Paulina.

Nothing can be more apparent than that the legislature could not have intended to prohibit any person from putting a cargo on board a vessel of any description.

1. The coasting trade was still lawful, and might be carried on by either registered or licensed vessels; consequently any vessel might be laden for that purpose.

2. There is no direct prohibition to lade a vessel with any articles whatever.

3. There are provisions in subsequent laws on the same subject which regulate the manner of lading vessels in order to entitle them to a clearance; which provisions are entirely incompatible with the idea that all lading was prohibited.

SCHOONER     With a view to this principle the section must be
PAULINA'S  construed.
CARGO
  *v.*          The first inquiry which presents itself to the mind is
STATES.  this; . Do the words " contrary to the provisions of
———————  this act or of the act to which this act is a supplement,"
limit and restrain both the succeeding members of the
sentence, or only the first of them? · Are they applicable only to " proceeding to a foreign port or place,"
or also to " trading with or putting on board any other
ship or vessel any goods, wares or merchandize."

If the sentence be construed literally and grammatically, the introductory words which have been stated,
are attached to all the offences afterwards described.
The departure without a clearance under any circumstances, is an offence.   The circumstances of the departure do not affect the case.   But to render the facts afterwards enumerated criminal, they must be committed
under circumstances described in the law.   " If any
ship or vessel shall, contrary to the provisions of this
act, or of the act to which this is a supplement, *proceed*
to any foreign port or place, or trade with, or put on
board of any other ship or vessel," &c.   " such ships or
vessels, goods, wares, and merchandize, shall be wholly
forfeited."   The connection between the different parts
of this sentence, is inseparable.   There is nothing to
disjoin them.   The nominative to the verbs, " proceed,"
" trade with," and " put on board," is the same.   It is
not repeated, but is to be found in the first part of the
sentence, and must be taken in the same sense, and with
the same qualifications.   The relative " such," in that
part of the sentence which inflicts the forfeiture, refers
to the ship or vessel, which contrary to the provisions,
&c. shall have done any one of the acts described.

  If this be the literal construction of the sentence, it is
still more apparantly its real meaning.

  If the words, " trade with, or put on board any other
ship or vessel," be not limited by the words " contrary
to the provisions of this act, or of the act to which this
act is a supplement," they would not only prohibit a
vessel from lading, but from unlading in a manner,
which is frequent, and perfectly innocent.   There are

many ports in the United States, whose situation requires that a sea vessel should stop at a considerable distance from the place for which she is destined, and, convey part of her cargo in lighters or river craft, to the place of destination. Under such circumstances, to load or unload, would amount to a forfeiture. But such was not the intention of the legislature.

Most apparently, then, both the letter and the spirit of the law must be disregarded, or it must be admitted that the " trading with, or putting on board," that is rendered culpable, must be such a trading with, or putting on board, as is " contrary to the provisions" of the original or supplementary act.

The subsequent words of the section imposing a penalty of from one to twenty thousand dollars on the offence, tend still further to illustrate and confirm this construction. They are " the master or commander of such ship or vessel, as well as all other persons who shall knowingly be concerned in such prohibited foreign voyage, shall forfeit and pay," &c.

The master or commander of the " ship or vessel" described in this part of the sentence, would seem to be the master or commander of any ship or vessel which had committed any one of the offences previously described. If this be true, it is difficult to resist the opinion that the words " as well as all other persons who shall knowingly be concerned in such prohibited foreign voyage" were considered by the legislature as applicable to all the voyages previously prohibited. Consequently the legislature, at the time, supposed themselves to be punishing foreign voyages only.

The Paulina having committed no offence by taking her cargo on board, unless she incurred the penalties of the law by receiving it from the May-flower, the sentence will now be examined with a view to this question. Is the employment in this way of a vessel whose business is confined to the rivers, bays and sounds within the jurisdiction of the United States, a forfeiture of the vessel and cargo?

SCHOONER     The bond given by such vessel is that she will not
PAULINA's    be employed in any foreign trade.
CARGO

  *v.*          This exemption from the necessity of relanding the
U.STATES.    cargo, proves the intention of the legislature that such
——————       craft might be employed in lading vessels.   This em-
             ployment is not contrary to the provisions of either the
             original or supplemental act.

             If, then, the May-flower had trans-shipped her cargo
             in the port in which she was laden, it is apparent that
             no part of the law would have been violated.

             The section under consideration inflicts forfeiture on
             any ship or vessel which shall depart from any port of
             the United States without a clearance or permit.

             If by law this would produce a forfeiture of the cargo
             when on board the Paulina, it is to be inquired whether,
             under this libel, the fact of her having passed out of
             one port into another without a clearance or permit, is
             examinable.

             The libel charges the simple fact of trans-shipment,
             without alleging the only circumstance which could
             render such trans-shipment criminal.  The question,
             then, of a departure from the port of Providence into
             that of Newport is not brought before the court.  It
             does indeed appear in the evidence that, in consequence
             of an opinion among the revenue officers, as well as
             others, a clearance in such a case was not requi-
             site—the May-flower carried a considerable part of her
             cargo to the Paulina without having obtained permits.
             But the court cannot notice this fact unless the prose-
             cution had, in some degree, been founded upon it.

             It is, then the opinion of the majority of the court
             that, as this case stands, the sentence cannot be sus-
             tained under the 3d section of the act of January, 1808.
             No opinion is given on the construction of that act in
             a case of trans-shipment from a vessel which has actu-
             ally passed from one district to another without a clear-
             ance.

             The libel also claims a forfeiture under the 50th sec-

tion of the collection law, and under the 2d section of the act commonly called the additional act.

It has been very truly observed that the collection law is in itself totally inapplicable to the case, and can only be relied on for the purpose of explaining the 2d section of the additional act which refers to the collection law.

The operative words of the 2d section are " No ship or vessel shall receive a clearance unless the lading shall be made hereafter under the inspection of the proper revenue officers subject to the same restrictions, regulations, penalties and forfeitures as are provided by law for the inspection of goods, wares and merchandize imported into the United States upon which duties are imposed."

Had the sentence terminated with the word " officers," it is admitted that its only operation would have been to exclude from a right to a clearance a vessel laden in a different manner from that which the act prescribes. The doubt grows out of the residue of the sentence.

This section does not, in terms, refer to the 50th section of the collection law. Whether, in strict grammatical construction, the adjective " subject" agree with and refer to the words " lading," " inspection" or " officers," still the " restrictions, regulations, penalties and forfeitures" which are inflicted, are those which are provided by law for the *inspection* of goods, not those which are provided by law for unlading them. The word *inspection* is the governing word which explains the meaning of the sentence; and the provisions for the inspection of goods contain restrictions, regulations, penalties and forfeitures; but they do not affect the cargo.

It is difficult to read the sentence without being impressed with the opinion that the sole penalty intended by the legislature was the denial of a clearance. This will strike any person as the principal object of the clause. What follows is expressed with some confusion and would not seem to constitute the most essential part of the sentence. It cannot be believed that the legisla-

SCHOONER ture could intend to inflict so heavy a forfeiture under
PAULINA's such cloudy and ambiguous terms. The natural as well
  CARGO   as usual course would be to inflict the forfeiture in di-
    *v.*     rect and substantive terms, not by way of loose uncer-
U. STATES. tain reference.

But if this section be construed as the Libellants con-
strue it, then if the value of $400 be put on board a
vessel, not only the goods so put on board, but the ves-
sel itself shall be forfeited. For what purpose, then,
direct that she shall not receive a clearance? The legis-
lature can scarcely be suspected of making a solemn
regulation which, in terms, forbids its officers to grant
a clearance to a vessel, which vessel is, by the same
sentence, confiscated.

It is the decided opinion of the court, that no for-
feiture is incurred under this section of the act.

The majority of the court is of opinion that the sen-
tence of the Circuit Court, condemning the cargo of the
Paulina, is erroneous and ought to be reversed.

The court certified that there was probable cause of
seizure.

The Chief Justice observed that three of the judges
who had heard the argument in the present case, and
one who did not hear it, but who had heard the points
argued in another case, concurred in this *opinion,* and
that the other judges concurred in the *result* of the
opinion.

JOHNSON, *Justice,* observed that he dissented from the
opinion just delivered by the chief justice upon one
ground only.

He was of opinion that the trans-shipment, if with
intent to prosecute a foreign voyage, in violation of the
embargo, subjected the goods to forfeiture. But as the
evidence of that intent was doubtful, he was of opinion
that the cargo should be acquitted; and two other judges
concurred with him in opinion.

*Sentence reversed.*