## UNITED STATES v. MARX (No. 256).[1]

IRON DRUMS—"TANKS OR VESSELS" CONTAINING GLYCERIN.
    Reviewing in full the history of legislation affecting these containers, cylindrical iron drums used in commerce to convey glycerin are held dutiable under paragraph 151, tariff act of 1909.

### United States Court of Customs Appeals, January 7, 1911.

APPEAL from a decision of the United States Board of General Appraisers, G. A. 7027
(T. D. 30644).

[Reversed.]

*D. Frank Lloyd*, Assistant Attorney General (*Martin T. Baldwin* on the brief), for the United States.
*B. A. Levett* for the appellees.

      Before MONTGOMERY, HUNT, SMITH, BARBER, and DE VRIES, Judges.

SMITH, Judge, delivered the opinion of the court:

Glycerin contained in iron drums was imported into the country at the port of New York. In addition to the duty which attached to the glycerin under paragraph 24 of the tariff act of August 5, 1909,

---

[1] Reported in T. D. 31210 (20 Treas. Dec., 71).

the collector assessed a duty of 30 per cent ad valorem on the containers under paragraph 151 of the same act. The importer did not challenge the assessment upon the glycerin, but protested that the iron drums should be admitted free of duty as the usual containers of the merchandise imported.

The Board of General Appraisers sustained the protest and the Government appealed.

The subject matter of this controversy consists of large cylindrical iron vessels or drums fitted with a bung closed by a screw cap. Two half-round iron hoops placed at the ends and two near the middle of these receptacles make it possible to move them conveniently from one place to another.

It is undisputed that for a period of about 30 years immediately prior to the importation under consideration glycerin was transported to the United States uniformly in these cylindrical iron drums, and that during all that time they were admitted free of duty as the containers in which glycerin was usually imported. In re protest of Curtis, Davis & Co. (T. D. 23131); United States *v.* Leggett (66 Fed. Rep., 300). The Government claims, however, that the Sixty-first Congress, during its first session, changed the status of the drums and made them dutiable by the introduction of the following language into paragraph 151 of the tariff act recently adopted:

151. * * * cylindrical or tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty, thirty per centum ad valorem. * * *

This legislation originated in the House and seems to have been induced primarily by certain data submitted to the Committee on Ways and Means by a compilation known as Notes on Tariff Revision, which was prepared for the information of the committee and considered by it in making up the tariff bill which it ultimately reported. The Notes, among other things, called particular attention to the interpretation which had been given by the courts to paragraph 152 of the tariff act of 1897, and pointed out that in the cases of Downing *v.* United States (99 Fed. Rep., 423), United States *v.* Liquid Carbonic Co. (T. D. 28863), and Knauth *v.* United States (T. D. 29010) certain large cylindrical and bottle-shaped metal vessels, and metal tanks and reservoirs, some of them 35 feet long and 8 feet in diameter, closed at both ends and equipped with plugs, valves, and manholes, had been judicially classified as tubes within the meaning of that paragraph. After some comment on these decisions it was suggested in the Notes that vessels of the character mentioned should be provided for specifically in the paragraph covering articles of metal wholly or partly manufactured, or that they should either be included by name in the paragraph to which the courts had assigned them or excluded from it by appropriate language. The Committee on Ways and Means appears to have been impressed by the second

suggestion and inserted the following provision in paragraph 150 of the bill as it was originally reported to the House:

150. * * * cylindrical or tubular tanks or vessels, for holding gas or liquids, thirty per centum ad valorem.  * * *

This clause passed the House and as a part of the House bill went to the Senate.  In the Senate, however, the Committee on Finance saw fit to amend the House provision, and reported it back so as to read:

150. * * * cylindrical or tubular tanks or vessels for holding gas, liquids, *or other material, whether full or empty*, thirty per centum ad valorem.  * * *

Thus reported it passed the Senate, went to conference, was agreed to by the House conferees, and finally became a part and portion of paragraph 151 of the tariff act approved August 5, 1909.

In brief, the House had before it for consideration certain large-sized, strongly built cylindrical or tubular metal tanks or vessels for holding gas and, possibly, liquid gases.  It decided that such vessels should pay a duty of 30 per cent ad valorem.  The Senate had before it the same class of vessels and in its wisdom it determined that such vessels, whether they contained gases or liquids *or other material and whether full or empty*, that is, whether they were acting as containers or not, should be dutiable at the same rate.  The House concurred in this broader dispensation, and that which was originally the intent of the Senate finally became the intent of Congress.

From this history of the provision counsel for the importers argue that as legislative action was induced by the Notes on Tariff Revision, which dealt only with the metal vessels which had been the subject of discussion in the cases above mentioned, the operation of section 151 should be restricted to that class exclusively and should not be extended to glycerin drums the nondutiable status of which had not been questioned.  In its last analysis this is a contention by the importers that the usual containers of glycerin were not in the legislative mind when this particular clause was under consideration and that therefore it could not have been the intention of Congress to alter a long-continued practice and make them dutiable.

Had the provision become law in the form in which it was first adopted by the House, and had the word "liquids" therein no broader comprehension than that of liquid carbonic gas or other liquid gases, there would be some show of force in the argument that such a provision should have no wider application than that suggested.  Unfortunately, however, for the position of the importers, the House provision was not allowed to stand in the Senate, and the words "*or other material, whether full or empty*" were added to it by that body.  Giving to these words their plain, obvious, and ordinary meaning it would appear that the Senate intended to go beyond the purpose originally contemplated by the House and to make dutiable at 30 per cent ad valorem not only cylindrical or tubular tanks or vessels for holding gas or liquids, but also *all* vessels of a

similar character for holding *any other material, and whether such vessels were full or empty.* · Whether we shall give to the words of the provision their plain, obvious, and ordinary meaning—whether we must determine the intent of the lawmaker solely from the language which he used—whether we can make an exception which he did not make—is therefore the question to be decided.

The language of the provision as it passed the Senate and finally became law is not vague, dubious, uncertain, indefinite, or ambiguous. There is nothing in it which leads necessarily to injustice or oppression and nothing which conduces to an absurd result. It is in contravention of no fixed or general policy of the Government. So far as the containers of specific-duty goods are concerned it conflicts with no express law—no actual expression of the legislative will, and is at war in no particular with the letter, spirit, intention, or meaning of the tariff act of 1909 taken as a whole. Under such circumstances it would seem that there is no ground for a reasonable belief that the Congress did not intend just what it said—that there is no room for construction, and therefore no sound, valid, or lawful reason for determining the true meaning of the statute—that is to say, the real intention of the legislature, by any other method than that of the language in which the law is expressed. A doubt as to the wisdom of a statute, a mere surmise or conjecture as to the legislative intent, affords no justification for the conclusion by a court that the legislature had some other intention than that which it clearly, obviously, and plainly expressed in words. A conclusion so reached would be nothing less than judicial legislation and a usurpation of functions which properly and constitutionally belong exclusively to another department of the Government.

To get at the thought or meaning expressed in a statute, contract, or a constitution the first resort in all cases is to the natural signification of the words, in the order of grammatical arrangement in which the framers of the instrument have placed them. If the words convey a definite meaning which involves no absurdity, nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted. * * * So, also, where a law is expressed in plain, unambiguous terms, whether those terms are general or limited, the legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction. * * * Words are the common signs that mankind make use of to declare their intention to one another; and when the words of a man express his meaning plainly, distinctly, and perfectly, we have no occasion to have recourse to any other means of interpretation. Lake County *v.* Rollins (130 U. S., 662, 670–671).

The primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that he has used. He is presumed to know the meaning of words and the rules of grammar. The courts have no function of legislation, and simply seek to ascertain the will of the legislator. It is true there are cases in which the letter of the statute is not deemed controlling, but the cases are few and exceptional, and only arise when there are cogent reasons for believing that the letter does not fully and accurately disclose the intent. United States *v.* Goldenberg (168 U. S., 95, 102–103).

It has been truly stated to be the duty of the court to effect the intention of the legislature; but this intention is to be searched for in the words which the legislature has employed to convey it. Paulina v. United States, Marshall, C. J. (7 Cranch, 52, 60).

Where the language of a statute is transparent and its meaning clear there is no room for the office of construction. There should be no construction where there is nothing to construe. Lewis v. United States (92 U. S., 618, 621).

Where the meaning of a statute is plain it is the duty of the courts to enforce it according to its obvious terms. In such a case there is no necessity for construction. Thornley v. United States (113 U. S., 310, 313).

The spirit of the act must be extracted from the words of the act and not from conjectures *aliunde*. Gardner v. Collins (2 Pet., 58, 92).

Where the legislature makes a plain provision, without making any exception, the courts of justice can make none, as it would be legislating to do so. Maxwell v. Moore (22 How., 185, 191).

This is not the first time that *usual* containers of merchandise have been made dutiable, and by language no clearer, no plainer, and no more obvious than that incorporated in the provision which is under discussion. In the case of United States *v.* Ross (91 Fed. Rep., 108), it was held that bottles, which were the usual containers of soda water, were dutiable under paragraph 88 of the tariff act of 1894, which was as follows:

88. Green and colored, molded, or pressed, and flint and lime glass bottles holding more than one pint, and demijohns and carboys, covered or uncovered, whether filled or unfilled, and whether their contents be dutable or free, and other molded or pressed green and colored and flint or lime bottle glassware, not specially provided for in this act, three-fourths of one cent per pound; * * * if holding less than one-fourth of a pint, forty cents per gross; all other plain green and colored, molded or pressed, and flint lime and glassware, forty per centum ad valorem.         -

The words of this paragraph,—

* * * bottles * * * whether filled or unfilled, and whether their contents be dutiable or free * * *

no more strongly indicate the legislative intention to make certain usual containers dutiable than does the language—

* * * cylindrical * * * vessels for holding gas, liquids, or other material, whether full or empty * * *

We can not agree with the board that the words "whether their contents be dutiable or free" distinguishes the Ross case from the case under consideration. Undoubtedly that special language was inserted in paragraph 88 of the tariff act of 1894 to avoid any complication which might arise touching the status of bottles as containers of goods exempt from duty. Their omission from paragraph 151 of the tariff act of 1909, whatever might be its effect on the usual containers of *free entry* goods, can hardly be twisted into a purpose to exempt from duty cylindrical vessels containing *dutiable* merchandise.

In the case of Schmidt *v.* Badger (107 U. S., 85), a collector of customs imposed a separate duty of 30 per cent ad valorem on glass bottles containing beer and ale. At the time of the importation

schedule D of section 2504 of the Revised Statutes contained the following provision:

Ale, porter, and beer in bottles, thirty-five cents per gallon; otherwise than in bottles, twenty cents per gallon.

Schedule B of the same section, among other things, provided as follows:

Glass bottles or jars filled with articles not otherwise provided for, thirty per centum ad valorem.

From the fact that the legislature imposed 15 cents per gallon more duty on ale, porter, and beer in bottles than was imposed on the same beverages in other receptacles it was argued that there was no intention to impose on such bottles under schedule B a further duty of 30 per cent ad valorem, and the case of Karthaus *v.* Frick was cited in support of the contention. Certainly in such a case there was *some* reason to surmise or conjecture that the additional duty of 15 cents per gallon was intended as a duty on the bottles and that there was no purpose to subject them to the duty prescribed by schedule B. Nevertheless the Supreme Court held that the duty of 35 cents per gallon was a duty on the *contents* of the bottles only and that the bottles themselves were dutiable at 30 per cent ad valorem. More than that, it held that the language of schedule B, "* * * bottles * * * filled with articles," was sufficient to deprive the bottles of the benefit of the principle laid down in Karthaus *v.* Frick. If the fact that beer in bottles paid an additional duty of 15 cents per gallon did not legitimately permit the deduction that they had already been subjected to a duty and so allow a disregard of the letter of the statute—if the language "Glass bottles * * * filled with articles" was sufficient to remove the bottles from the category of nondutiable containers, it is difficult to understand upon what theory this court would be justified in restricting the broad but explicit terms of paragraph 151, or upon what defensible ground cylindrical vessels containing glycerin could be singled out and excluded from its operation. Once the lawmaking power has clearly expressed its intention, the motives which actuated it—the reasons which induced the legislation—are beside the question. But if it were proper to inquire into them in this case they might be found in the fact that the admission free of certain classes of containers had been a fruitful source of trouble, friction, and litigation, or in the fact that some of such containers, among them glycerin drums, as appears from the record, had been treated as merchandise by importers who sold them in the markets of the country and thus brought them into competition with similar articles of domestic manufacture.

In addition to the claim that the drums are free of duty as usual containers, the importers set out in their protest that they were free

listed under the provisions of paragraph 500. A reading of the paragraph clearly discloses that it exempts not drums to import glycerin, but "iron or steel drums used for the shipment of acids, of either domestic or foreign manufacture * * * actually exported from the United States." While we are not prepared to say, all the circumstances considered, that this provision, standing by itself, would justify the application of the principle that an exception made by the statute itself excludes all other exceptions, we do think that its history tends to show that the broad language of paragraph 151 was not a mischance. It appears from the Tariff Hearings, 7343-7345, that complaints were made to Congress that *glycerin drums* admitted free of duty and subsequently used to export American acids were assessed for duty on their return. Following these complaints the provision of paragraph 500, above set out, was enacted. From this it may be fairly assumed that Congress could not have forgotten the practice of admitting glycerin drums free of duty and that their removal from the category of duty-free containers under the literal terms of the statute was not the result of a legislative lapse.

The drums involved in this appeal are cylindrical iron vessels designed to hold glycerin, a liquid, a material. They are therefore dutiable as assessed by the collector.

The decision of the Board of General Appraisers is *reversed*.