(C. D. 1662)

C. M. GOURDON, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided December 7, 1954)

*John D. Rode* for the plaintiff.

*Warren E. Burger*, Assistant Attorney General (*Richard H. Welsh*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

FORD, Judge: This suit was filed by the plaintiff seeking to recover a certain sum of money alleged to have been illegally exacted as customs duties upon an importation of silk cloth. The collector classified the merchandise as follows:

Woven fabrics in the piece, wholly or in chief value of silk, n. s. p. f., or as woven fabrics in the piece, with fibers wholly of silk, whether or not exceeding 30 inches in width, whether woven with fast or split edges, and whether or not Jacquard-figured, valued at more than $5.50 per pound, unbleached, etc.

In accordance with the above classification, the collector levied duty upon said merchandise at the rate of 55 per centum ad valorem under paragraph 1205 of the Tariff Act of 1930.

Plaintiff claims said merchandise to be properly dutiable under said paragraph 1205, *supra*, as modified by the French Trade Agreement, 69 Treas. Dec. 853, T. D. 48316, reading as follows:

Woven fabrics in the piece, with fibers wholly of silk, bleached, dyed, colored, or printed, whether or not exceeding 30 inches in width, whether woven with fast or split edges, and whether or not Jacquard-figured, valued at more than $5.50 per pound, 45% ad val.

Prior to the trial of this case, the following stipulation of facts was agreed upon and signed by counsel for the respective parties:

IT IS HEREBY STIPULATED AND AGREED by and between counsel for the plaintiff and the Assistant Attorney General for the United States, as follows;

1. That the merchandise the subject of this protest consists of woven fabrics in the piece, the fibers of which are wholly of silk, valued at more than $5.50 per pound.

2. That the official sample be received in evidence as Exhibit 1.

3. That the report of the United States Customs Laboratory be received in evidence as Exhibit 2.

4. That the merchandise herein was boiled-off or degummed by the following process:

It was submerged in a solution of water and neutral soap. The amount of such neutral soap was approximately 30 per centum of the weight of the fabric.

The solution of water and soap was brought to a temperature just below the boiling point before the fabric was submerged and was maintained at that temperature during the period of submersion which was between one and two hours. After this first submersion the fabric was taken out and rinsed in clear water. After rinsing the fabric was again submerged in a new solution of soap and water having the same proportionate amount of soap as the first solution and maintained at the same temperature. After the second submersion, which again was for a period between one and two hours, the fabric was removed and rinsed in a solution of water containing one gramme of sodium carbonate per liter. The fabric was then dried and was ready for shipment.

5. That as a result of said process the sericin or gum was removed, the merchandise became softer and less harsh, stains and oil, if any, from the weaving were removed, the merchandise became lighter in color, was fit for use in its imported condition without further processing except where an end fabric lighter in color was desired, and was ready for printing in all colors except the lighter or pastel shades in which case further preparatory processing would be necessary.

6. That Exhibit 3 may be received in evidence as representing the condition and appearance of the imported merchandise prior to said treatment.

7. That the raw silk used in weaving the imported merchandise was composed of filaments or fibres from five or more cocoons reeled together into a continuous uniform and regular strand, each of which said filament or fibre consists essentially of two cores of fibroin cemented together and covered with sericin, the sericin containing more of the coloring matter of the raw silk than the fibroin.

IT IS FURTHER STIPULATED AND AGREED that the above-entitled protest be placed upon the October, 1953, Calendar of the Court for all purposes.

At the trial of the case, the exhibits referred to in the above stipulation were admitted in evidence and marked with the respective numbers assigned to them in the stipulation. The customs laboratory report, exhibit 2, states:

The sample is a boiled off silk fabric. In our opinion, it is not bleached or colored.

When the case was called for trial, the plaintiff rested. Thereupon, the defendant offered the testimony of three witnesses, and the plaintiff offered the testimony of one witness. Each of the witnesses appeared to be well qualified to testify regarding the boil off and bleaching of silk and silk fabrics, and we do not deem it necessary to elaborate upon the qualifications of the various witnesses.

The first witness testified for the Government that in the boil-off process the gum of the silk is removed and at the same time the stains.

which might have been made by the weavers, usually come off, and that he would say that the color structure of the fibroin itself had not been changed or affected by the boil-off process. The witness was shown a sample of the involved merchandise, exhibit 1, and asked whether or not, in his opinion, that fabric had been bleached, to which he replied: "It is very hard to tell, but I do not think so. * * * It seems to me that it should be whiter; it should be whiter in color if it had been bleached. * * * I feel it could be whiter after bleaching."

Counsel for the defendant then read to the witness the process to which the involved merchandise had been subjected, and the witness was asked whether or not, in his opinion, a silk fabric so treated was bleached, to which the witness replied: "My answer is 'no' "; that the color of the fibroin was not affected by such process.

On cross-examination, the witness testified as follows:

X Q. Isn't most of the coloring matter in silk in the sericin or gum?—A. It shows in the sericin, which is gum; the coloring comes off with the sericin.

X Q. If you remove the sericin from silk, don't you remove most of the color?—A. You remove the color which the sericin contains.

X Q. I ask you again, isn't most of the color of silk in the sericin or gum?—A. Yes.

X Q. So that if you remove the sericin or gum you therefore remove most of the color?—A. That's right.

* * * * * * *

X Q. Have you ever been asked to process silks in the gum, or grege goods in which you merely boil them off?—A. Yes.

X Q. You have stopped at this point?—A. Boil-off, yes.

X Q. And did that make them lighter than when you started with them?—A. That's right.

X Q. Now, would you look at Exhibit 3, please? You recognize what that is?—A. It's a piece in the grege.

X Q. That's the same as saying it's not degummed, it's in the gum?—A. That's right.

X Q. Would you say there was a difference in color between Exhibit 1 and Exhibit 3, which you are holding?—A. Yes, there is.

X Q. Would you say that Exhibit 1 was lighter in color?—A. It is.

X Q. You notice a substantial difference in color between them?—A. Yes.

The witness readily admitted that there were different degrees of bleaching; that there were different methods of bleaching and different ways to bleach different things.

X Q. If bleaching is the removal of color, wouldn't you have to know what the object was like before it had been subjected to any process?—A. Yes, sir.

X Q. So that it's a question of the appearance of the article, right?—A. That's right.

X Q. Well, if it's a question of appearance what difference does it make how the result is obtained?—A. It does not make any difference if there is a lighter color obtained.

* * * * * * *

JUDGE LAWRENCE: [Referring to exhibit 1] It looks white to me, I don't know.

THE WITNESS: I can give only my opinion and I can not say I am positive.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

JUDGE LAWRENCE: Mr. Chariere, is Exhibit 1 in a condition finished for immediate use as a fabric?

THE WITNESS: Yes; it could be used as it is.

JUDGE LAWRENCE: For what purpose or purposes?

THE WITNESS: Well, for printing, dyeing. You could dye it or you could use it this way. After all, this is a shade.

JUDGE LAWRENCE: Could that be used for making a blouse, or anything of that sort?

THE WITNESS: Yes.

With reference to exhibit 1, witness Helmus testified that:

X Q. Would you say that Exhibit 1 was not ready for use?—A. It's ready for use if you want to use it that way.

X Q. Don't you know that millions of yards have been used exactly in that condition?—A. I have no doubt of that.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Would you say that as a result of the boiling-off process the gum is removed?—A. Yes.

X Q. The silk becomes softer and less harsh?—A. That's correct.

X Q. Stains and oil, if any, are removed?—A. In most cases, yes.

X Q. That the silk becomes lighter in color?—A. That is correct.

X Q. Would you say it was fit for use?—A. If you want to use it that way it's fit for use.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. If it is a fact that the boiling-off process does make a silk lighter, isn't it conceivable that it's light enough, it may be light enough to be used for many purposes?—A. That's correct.

X Q. And isn't it a fact also that if you want a silk to a certain ultimate degree of whiteness you may have to use chemicals?—A. That's correct.

X Q. So it's a question of degree, isn't it, how white you want to make it?—A. It's a question of choice, that's correct.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

X Q. Suppose we had something in an absolute white condition, would you say that was bleached irrespective of how it had been brought to that condition?—A. No.

X Q. You would not?—A. No.

The testimony of witness Di Maria is in substantial agreement with that given by the previous two witnesses.

Witness Albert Marx testified for the plaintiff as follows:

Q. Do you know what the purpose of boiling-off or degumming is?—A. Well, I can give you my personal opinion on it.

Q. I wish you would—A. In my personal opinion it would act in two different ways; number one is to take the gum out of the silk, and number two is to bleach it into white in the same operation.

Q. Does it make the fabrics any softer?—A. Absolutely.

Q. Does it remove stains if there are any stains?—A. That's true.

Q. Does it make it ready to be used?—A. Yes.

Q. And I think you stated that it made it lighter in color, did you not?—A. Absolutely.

To the hypothetical question of whether or not, in his opinion, silk subjected to the process described in the stipulation had been bleached, the witness answered:

Yes; I would say so. And I would say that the fact of the matter is that when they had it in one boil-off for that hour and a half or two of course all the gum came off, and that they removed it to make a clean boil-off so that they can get a better bleach out of it as far as the whiteness of the fabric. And I think that was their purpose of the double boil-off.

\*      \*      \*      \*      \*      \*      \*

X Q. On the majority of fabrics, then, you can destroy without the use of peroxide—you can destroy the inherent nature of the fibroin?—A. That's right.

X Q. It will reach the fibroin itself?—A. It would reach to a point where it's white.

X Q. But if you want it whiter than your degumming process will bring it, what do you do to it?—A. As I tried to explain to you, that we have some silks that come out at a point where there is nothing that will make them any whiter except the ones that have the yellow fibroin.

\*      \*      \*      \*      \*      \*      \*

R Q. Mr. Marx, what do you do when you get an order to boil-off and bleach?—A. We prepare the goods for the boil-off. We put it in the boil-off for a certain length of time it requires. We put it into the dye boxes and we give it two rinses. And it's boiled off and bleached white and it is ready for shipment, outside of the dyeing and finishing process.

R Q. Is it your testimony that frequently, and I think you said in the most number of cases, the boiling-off process itself is sufficient bleaching to get it to the whiteness that the customer wants?—A. That's right.

\*      \*      \*      \*      \*      \*      \*

JUDGE LAWRENCE: The boiling-off or scouring process is primarily to remove the natural oils and waxes created by the silk worm in producing the silk, is that right?

THE WITNESS: That's right, sir.

JUDGE LAWRENCE: And if your boiling-off process is conducted properly may you remove sufficient of those unwanted materials to produce a bleached fabric?

THE WITNESS: That's right, your Honor; it's possible. And it's been done every day in our plant.

JUDGE LAWRENCE: On certain types of silk?

THE WITNESS: On certain types of silk we absolutely get a pure white out of them.

JUDGE LAWRENCE: Now, if you wanted to get a purer white you proceed with chemicals like peroxide of hydrogen to remove more of the same materials that you tried to remove by the boiling-off process?

THE WITNESS: That's right, your Honor.

\*      \*      \*      \*      \*      \*      \*

JUDGE LAWRENCE:   But you say that at your plant you are actually producing bleached white silk fabrics in the scouring process?

THE WITNESS:   As far as the boil-off process, yes, sir; that's done every day.

This record makes it clear that there is a difference between the boil-off or degumming process, where the silk is submerged in a solution of hot water and neutral soap, and the process generally referred to as bleaching, where the silk is submerged in a solution of water and peroxide of hydrogen, to which is added some silicate of soda, in order to have the bath working and the bleaching take place.

Based upon the record herein, counsel for the plaintiff contends that the process to which the involved merchandise was subjected constituted a bleaching within the meaning of that term, as used in said paragraph 1205, as modified, *supra*, while counsel for the defendant contends that "The involved merchandise is *boiled-off, scoured,* or *degummed,* but is *not* bleached."

The primary question to be decided in this case is one of law, to wit, does the process to which the involved merchandise had been subjected prior to importation, as set out in the stipulation, heretofore quoted, render the involved silk bleached within the meaning of that term, as used in paragraph 1205, *supra?*

Each of defendant's witnesses and the plaintiff's witness testified that exhibit 1, representing the involved merchandise, was substantially lighter in color than exhibit 3, the same merchandise before it was subjected to the boiling-off process.

In Thorpe's Dictionary of Applied Chemistry, volume II, pages 17, 18, we find the following:

**Composition of Raw Silk.**—Raw silk consists of a double filament of fibroin covered with a layer of silk gum; the gum surrounds each of the filaments of fibroin and cements the two together.   Silk gum consists chiefly of sericin, but contains also small amounts of fats, of mineral substances, and of yellow colouring matters, chiefly xanthophyll. * * *

**Silk degumming.**—Raw silk is harsh, stiff and lustreless, but when the external layer of gum is removed it becomes soft and lustrous and the dyeing properties are improved.   The substances to be removed include not only sericin, but also the natural fats and colouring matters contained in the gum and any fats and tinting colours that may have been added by the throwster in preceding operations.   Care must be taken that the fibroin filaments are not attacked, or the lustre and strength of the silk will be impaired.

\*      \*      \*      \*      \*      \*      \*

**Silk bleaching.**—The colouring matters of raw silk are chiefly in the gum, and after complete degumming the fibre is nearly white.   Further bleaching is, however, necessary if the silk is to be marketed white or is to be dyed in pale shades.

Corpus Juris Secundum, volume 11, page 362, defines "bleach" as follows:

To make white or whiter by removing color; specifically, to whiten, as linen, etc.' by washing and exposure to the action of the air and sunlight, or by chemical preparations.

Webster's New International Dictionary, Second Edition, 1949, defines the word "bleach" as:

**bleach,** *v.* Transitive: **1.** To make white, or whiter; as: **a** To remove the color or stains from; blanch. The bleaching of natural fibers to remove coloring matter, resin, wax, etc., includes washing, or scouring, and bleaching proper, or chemical treatment.

The Encyclopaedia Britannica, volume 3, page 711, 1947, defines "bleaching" as follows:

**Bleaching.** This term implies the whitening of objects or depriving them of colour. In its industrial application, however, the term signifies not only the removal of the natural colour but other impurities from cotton, linen, wool, silk and other fibres, paper-pulp, bees' wax, and some oils.

In the case of *Armand Schwab & Co.* v. *United States,* 32 C. C. P. A. (Customs) 129, C. A. D. 296, the Court of Customs and Patent Appeals, in deciding that certain hats were bleached, said:

* * * They were not bleached white, it is true, but the colors in the straw which were present before the hats were processed were removed. There is no degree of bleaching set out in the paragraph, and therefore the removal of color to any substantial degree must be considered as coming within the common meaning of the term "bleached."

\*        \*        \*        \*        \*        \*        \*

There is nothing in the *Armand Schwab* case, *supra* [30 C. C. P. A. (Customs) 72, C. A. D. 218], to sustain appellant's contention. In fact we stated there that "We do not wish to be understood as holding, however, that hats which have been advanced in condition for their intended use by a bleaching process were not intended by the Congress to be included within paragraph 1504 (b) (2)."

The hats here involved certainly have been advanced in condition, and no further bleaching is necessary or desirable to render them ready for use as natural leghorns. While the decision in the *Armand Schwab* case, *supra,* does not control here, nevertheless, what was said there rather supports the contention of appellee.

\*        \*        \*        \*        \*        \*        \*

Appellant argues in its brief that the term "bleached" as it appears in the involved paragraph applies more to "the effect produced, rather than in the means of producing that effect," but it is not necessary to consider this argument for the reason that the hats themselves together with other exhibits of old and new straw demonstrate that the hats are bleached.

In considering the contention of the defendant, and the testimony offered in support thereof, it should be borne in mind that paragraph 1205 of the Tariff Act of 1930 does not contain any provision that the merchandise therein provided for shall, or shall not, be bleached. Neither does said paragraph 1205, as modified, *supra,* contain any provision that the merchandise therein provided for shall be bleached white, that it shall be bleached pure white, or that it shall be bleached by a chemical bleaching process. The term bleached, in said modified paragraph 1205, is without limitation, and we would not be authorized to assume that the negotiators of the trade agreement with France intended the term to be limited to bleaching accom-

plished in a certain manner or by a certain method. On the contrary, we must presume that if the negotiators of said trade agreement had intended the term bleached to be limited or circumscribed in any manner, such limitation would have been contained in said modified paragraph.

As supporting the views above expressed, we quote the following from the case of *Edgar Allen Steel Co.* v. *United States*, 16 Ct. Cust. Appls. 26, T. D. 42715:

The language in the second proviso of paragraph 305 is not ambiguous and will result in no absurdity or conflict with any other part of the statute, if given the definite meaning which its words clearly import. The courts are, therefore, bound to determine the intention of Congress by the language which was actually used and have no right to give any meaning to such language other than that conveyed by the words, terms, or expressions in which the legislative will was expressed. *United States* v. *Marx*, 1 Ct. Cust. Appls. 152, 155; *Paulina* v. *United States*, 7 Cranch 52, 60; *Lewis* v. *United States*, 92 U. S. 618, 621; *Thornley* v. *United States*, 113 U. S. 310, 313; *Lake County* v. *Rollins*, 130 U. S. 662, 670–671; *United States* v. *Goldenberg*, 168 U. S. 95, 102–103.

Where the language is plain and unmistakable, there is nothing to construe and to determine the purpose of the legislation in any other way than by giving to a plain statute its plain meaning would be nothing less than judicial legislation. *Maxwell et al.* v. *Moore et al.*, 22 Howard 185, 191.

In *Lake County* v. *Rollins*, 130 U. S. 662, 32 L. ed. 1060, the Supreme Court of the United States said:

* * * Why not assume that the framers of the Constitution, and the people who voted it into existence, meant exactly what it says? At the first glance, its reading produces no impression of doubt as to the meaning. It seems all sufficiently plain; and in such case there is a well settled rule which we must observe. * * *

* * * If the words convey a definite meaning, which involves no absurdity nor any contradiction of other parts of the instrument, then that meaning, apparent on the face of the instrument, must be accepted, and neither the courts nor the Legislature have the right to add to it or take from it.* * * So, also, where a law is expressed in plain and unambiguous terms. whether those terms are general or limited, the Legislature should be intended to mean what they have plainly expressed, and consequently no room is left for construction.

In the case of *Crooks* v. *Harrelson*, 282 U. S. 55, the Supreme Court of the United States observed that:

Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter. *Monson* v. *Chester*, 22 Pick. 385, 387. It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd or otherwise objectionable. But in such case the remedy lies

with the law making authority, and not with the courts. See *In re Alma Spinning Company*, L. R. 16 Ch. Div. 681, 686; *King v. Commissioners*, 5 A. & E. 804, 816; *Abley v. Dale*, L. J. (1851) N. S. Pt. 2, Vol. 20, 233, 235. And see generally *Chung Fook v. White*, 264 U. S. 443, 445; *Commr. of Immigration v. Gottlieb*, 265 U. S. 310, 313.

It appears to be the theory of the defendant that the removal of the color to a substantial degree from the involved silk by removing the gum therefrom is not bleaching and that the statute will be satisfied only if the color to a substantial degree be removed from the fibroin *per se*. In answer to this contention, it must be stated that the statute does not provide that the color must be removed to a substantial degree from the fibroin *per se*, rather than from the raw silk, or from the silk, before being degummed. To sustain the contention of defendant, might require a rewriting of the involved paragraph substantially as follows:

Woven fabrics in the piece, with fibers wholly of silk, the fibroins of which have been bleached, dyed, colored, or printed, whether or not exceeding 30 inches in width, whether woven with fast or split edges, and whether or not Jacquard-figured, valued at more than $5.50 per pound, 45 percent ad valorem.

Adherence to the sound principles announced in the authorities set out above precludes this court from thus rewriting the involved paragraph. Counsel for the respective parties have agreed that the sericin or gum was removed from the involved merchandise, that stains and oil from the weaving were removed, that the merchandise became lighter in color, and that the sericin contained more of the coloring matter than the fibroin. When these facts, which have been agreed to by counsel for the respective parties, are considered in connection with the holding of the Court of Customs and Patent Appeals in the *Armand Schwab* case, *supra*, that "the removal of color to any substantial degree must be considered as coming within the common meaning of the term 'bleached,'" we see no escape from the conclusion that the involved woven silk fabric is bleached. No attempt was made in this case to establish commercial designation, and we must, therefore, consider the term "bleached" in accordance with its common meaning. Any other view would require a complete disregard for the plain language contained in the *Armand Schwab* case, *supra*, as to what constitutes bleaching. This we are not at liberty to do.

This record shows that by the boiling-off or degumming process the involved merchandise has been advanced in condition for its intended use, which process removes the color from the silk to a substantial degree. This fact is established by the stipulation and is supported by the testimony of all the witnesses.

Based upon the facts in this case, for the reasons stated, and following the cited authorities, we hold that the woven silk fabric involved in this case is bleached within the meaning of that term, as used in

paragraph 1205, as modified, *supra*, and is properly dutiable thereunder at the rate of 45 per centum ad valorem, as alleged by the plaintiff.

To the extent indicated, the specified claim in this suit is sustained; in all other respects and as to all other merchandise, all the claims are overruled. Judgment will be rendered accordingly.