UNITED STATES *v.* GARRAMONE (No. 636).[1]

1. "CYLINDRICAL OR TUBULAR TANKS OR VESSELS" DEFINED.

It would seem "cylindrical or tubular tanks or vessels" appearing in paragraph 151, section 1, tariff act of 1909, must be taken to refer to containers made in part at least of metal and of such strong and permanent construction that on being emptied of their contents they might properly be devoted to further similar use and possessing appreciable value for such purposes.

2. VEGETABLES IMPORTED IN TIN-CONTAINERS.

In view of the legislative history of the clause and its judicial interpretation, and in view of the common significance of the language employed, the cylindrical containers as described in paragraph 151, section 1, tariff act of 1909, can not be taken to remove small tin cans with contents of tomatoes and of tomato sauce from the operation of subsection 18 of section 28 of that act, though these tins are cylindrical in shape and they were dutiable ad valorem under said subsection 18.— United States *v.* Marx & Rawolle (T. D. 31210).

United States Court of Customs Appeals, May 10, 1911.

Appeal from Board of United States General Appraisers, Abstract 24821 (T. D. 31300).

[Reversed.]

*D. Frank Lloyd,* Assistant Attorney General (*Charles. E. McNabb* on the brief), for the United States.
*Brown & Gerry* for appellee.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

BARBER, Judge, delivered the opinion of the court:

The merchandise imported in this case was fresh tomatoes and tomato sauce contained in what appear to be ordinary tin cans, commonly used

---

in the transporting, holding, and preserving, until consumed, of similar and like merchandise.

As appears by the exhibits in the case, the cans are cylindrical in shape, are made without handles, rivets, or hoops, and by soldering or other treatment are apparently hermetically sealed. Upon the outside of each can appropriate lithographic pictures and advertisements on paper have been pasted or otherwise attached.

Exhibits 2 and 3 contain fresh tomatoes and Exhibits 1 and 4 contain tomato sauce. The outside dimensions of the cans we find, upon an examination thereof, to be approximately as follows: Exhibit 1, $2\frac{1}{8}$ inches high and $2\frac{1}{8}$ inches in diameter; Exhibit 4, $3\frac{3}{8}$ inches high and $2\frac{1}{8}$ inches in diameter; Exhibit 2, $4\frac{3}{4}$ inches high and $4\frac{3}{8}$ inches in diameter; Exhibit 3, $4\frac{1}{8}$ inches high and $3\frac{1}{2}$ inches in diameter.

The value of the contents of any of these cans does not appear.

The merchandise was imported from Italy, and the value of the cans by the 100 in the money of that country, as appears from the evidence, is as follows: Exhibit 1, 4.25 lire; Exhibit 2, 14 lire; Exhibit 3, 8 lire; Exhibit 4, 4.75 lire.

The contents of the cans are subject to duty at the rate of 40 per cent ad valorem. The collector included the value of the tins in the dutiable value of their contents, pursuant to the provisions of subsection 18 of section 28 of the tariff act of August 5, 1909.

The importers claimed that the value of the contents should not be so included, but that duty should be assessed thereon separately at the rate of 30 per cent ad valorem under that part of paragraph 151 of section 1 of the same act which relates to cylindrical or tubular tanks or vessels.

The board sustained the claim of the importers, from which decision the United States appealed and the case is here for review upon this question only.

We insert here so much of the act above referred to as seems necessary for the consideration of the issue raised:

151. Lap-welded, butt-welded, seamed, or jointed iron or steel tubes, pipes, flues or stays, not thinner than number sixteen wire gauge, if not less than three-eighths of an inch in diameter, one cent per pound; if less than three-eighths of an inch and not less than one-fourth of an inch in diameter, one and one-half cents per pound; if less than one-fourth of an inch in diameter, two cents per pound: *Provided*, That no tubes, pipes, flues, or stays made of charcoal iron shall pay a less rate of duty than one and one-half cents per pound; cylindrical or tubular tanks or vessels for holding gas, liquids, or other material, whether full or empty, thirty per centum ad valorem; flexible metal tubing or hose not specially provided for in this section, whether covered with wire or other material or otherwise, including any appliances or attachments affixed thereto, thirty per centum ad valorem; welded cylindrical furnaces, tubes, or flues made from plate metal and corrugated, ribbed, or otherwise reinforced against collapsing pressure, two cents per pound; all other iron or steel tubes, finished, not specially provided for in this section, thirty per centum ad valorem.

SEC. 28. That the act entitled "An act to simplify the laws in relation to the collection of the revenues," approved June tenth, eighteen hundred and ninety, as amended, be further amended to read as follows:

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"SEC. 18. That whenever imported merchandise is subject to an ad valorem rate of duty, or to a duty based upon or regulated in any manner by the value thereof, the duty shall be assessed upon the actual market value or wholesale price thereof, at the time of exportation to the United States, in the principal markets of the country from whence exported; that such actual market value shall be held to be the price at which such merchandise is freely offered for sale to all purchasers in said markets, in the usual wholesale quantities, and the price which the manufacturer or owner would have received, and was willing to receive, for such merchandise when sold in the ordinary course of trade in the usual wholesale quantities, including the value of all cartons, cases, crates, boxes, sacks, casks, barrels, hogsheads, bottles, jars, demijohns, carboys, and other containers or coverings, whether holding liquids or solids, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, and if there be used for covering or holding imported merchandise, whether dutiable or free, any unusual article or form designed for use otherwise than in the bona fide transportation of such merchandise to the United States, additional duty shall be levied and collected upon such material or article at the rate to which the same would be subjected if separately imported. That the words 'value' or 'actual market value,' or 'wholesale price,' whenever used in this act, or in any law relating to the appraisement of imported merchandise, shall be construed to be the actual market value or wholesale price of such, or similar merchandise comparable in value therewith, as defined in this act."

The appellees claim that the rule expressed in said subsection 18 for the assessment of duty upon the usual coverings of merchandise subject to an ad valorem duty has no application in cases where the statute has specifically set aside a particular kind of coverings as subject to duty, that the tin cans involved in this case are cylindrical vessels within the meaning of said paragraph 151, and, therefore, are not subject to the rule referred to in said subsection 18.

The claim of the United States, in substance, is that the portion of paragraph 151 relied upon by the appellees does not include the cans involved in this case, and it refers in support of its contention to certain judicial interpretations of paragraph 152 of the tariff act of July 24, 1897, and to the history of the legislation which resulted in the enactment of said paragraph 151, which paragraph it is obvious was a reenactment, with certain changes and additions, of said paragraph 152.

This court had occasion to consider a similar question in the case of United States v. Marx & Rawolle (1 Ct. Cust. Appls., 152; T. D. 31210), and it is claimed by the appellees that the construction there given to the statutes involved is decisive of the issues here.

It is material, therefore, to know what was the issue there. It appears from the opinion in the case that the receptacles under consideration were certain large cylindrical iron vessels or drums fitted with a bung closed with a screw cap. Two half-round iron hoops were placed at the ends and two near the middle of these vessels to make it

possible to move them conveniently from one place to another. They were usual containers used in importing glycerin into this country, and the glycerin being subject to a specific duty, these vessels had for many years been permitted free entry.

The undisputed evidence of record·in that case further shows that those drums or vessels were 43 inches in length and 30 inches in diameter, outside measurements; that after importation they were used to hold or store the glycerin until it was removed for refining or other purposes, and when emptied they were in some instances sold and in others reshipped abroad to be again returned as containers of the same merchandise in subsequent importations, which process, one witness testified, would be several times repeated. It was also testified without contradiction that an attempt had been made to import the same merchandise in wooden barrels, but that method had been abandoned because the glycerin was so heavy the barrels would not stand the strain. No sample of those containers was before us in that case, but it was conceded by importers' counsel that the drums were riveted and that the iron hoops formed an integral part of the drums, designed for facility in rolling or handling them.

We have examined and referred to the evidence in that case for the purpose of indicating clearly the character and construction of the containers there involved. It is obvious from what we have said that they were solid and substantial in their make, stronger than wooden barrels, of such durability as to enable them to withstand the wear and strain incident to repeated shipments from and to foreign countries, one way full and the other empty, and in addition so constructed that·the contents could be and were removed without destruction or damage to the containers themselves.

The importers here claim that because the containers above described were by this court, in the Marx & Rawolle case, held to be dutiable under paragraph 151, it necessarily follows that the tin cans here involved, being of metal and cylindrical or tubular in shape, are vessels within the meaning of the paragraph as construed by us, and so are likewise dutiable thereunder.

In the Marx & Rawolle case it was urged upon us that if the provision of paragraph 151, under consideration, be construed in its literal sense, without regard to the language of the rest of the paragraph, all cylindrical vessels, including such articles as collar and cuff boxes and fountain pens, might be classifiable thereunder, and that if sufficient regard were had to the remainder of the paragraph to require the cylindrical vessels to be of metal, it might include not only such articles as the cans in question in this case but also tin boxes used to contain salves, ointments, and shaving soaps, and, ·to quote from the importers' brief in that case, "in fact every conceivable container or holder, regardless of its size or use, provided only that it is approxi-

mately cylindrical or tubular in shape," and we are now confronted with a claim which, if tenable, is about as far-reaching in its effect.

The proceedings in Congress and the matters brought to its attention which resulted in the enactment of paragraph 151 are sufficiently referred to in our opinion in the Marx & Rawolle case. It is entirely obvious therefrom that the attention of Congress was directed to certain large cylindrical and bottle-shaped metal vessels and metal tanks and reservoirs, some of them 35 feet long and 8 feet in diameter, closed at both ends and equipped with plugs, valves, and manholes, all of which had been judicially classified as tubes within the meaning of paragraph 152 of the act of 1897, which, as we have said, was the immediate predecessor of paragraph 151 of the act of 1909.

In determining the construction to be given paragraph 151 we held in the Marx & Rawolle case that in view of the judicial interpretations of paragraph 152 of the act of 1897 to which the attention of Congress had been directed and of the proceedings which took place in Congress which resulted in the enactment of paragraph 151, it was the manifest legislative intent to provide that " not only cylindrical or tubular tanks or vessels for holding gas or liquids, but also all vessels of a similar character for holding any material, and whether such vessels were full or empty," should be subject to the provisions of said paragraph. The expression " all vessels of a similar character " refers to those cylindrical or tubular tanks or vessels to which the attention of Congress had been directed, which were, as stated in the opinion, in brief, to be " certain large-sized, strongly built cylindrical or tubular metal tanks or vessels for holding gas, and possibly liquid gases," the descriptive uses of which Congress extended from that of containers of " gas or liquid gases" to " liquids or other material," and the descriptive condition of which it likewise extended so as to include them whether " full or empty."

Consistent with this intrepretation of the paragraph, we decided that the glycerin drums involved in that case came fairly within the kind and description of containers intended to be made dutiable under paragraph 151.

It is manifest that there is a great difference between the containers under consideration in the Marx & Rawolle case and those here involved. As appears in that case, they were strongly built and of such strength, durability, and weight as to adequately serve the purpose of a container not only for one but also for successive importations of a substance so heavy that a wooden barrel had been found inadequate therefor.

These facts of themselves, taken in connection with the size of the drums, warrant the inference that they had a considerable value; that they were susceptible of other uses, either as containers or as holders of substances other than glycerin and might be used permanently therefor; and the fact that they were in some instances sold

instead of being used for subsequent importations would warrant the presumption that they entered into the commerce of this country in competition with similar articles manufactured here.

The articles in the case at bar are of another class altogether. It is common knowledge that in removing the contents of these tin cans one end is cut open or cut out; that when the contents are taken therefrom the cans generally serve no further or other useful purpose and become the old tin can that forms a constituent element of most rubbish heaps; that they have no appreciable, if any, value; that they do not enter into or become a part of the trade and commerce of this country or compete with like articles manufactured here; that they are bought and sold while the contents remain therein, with and as a part of the contents, and that the value of the can is not considered in such transactions of purchase and sale.

There is no evidence that the cans involved in this case are of any value after their contents are removed or that they ever become the subject of trade in any sense or that they are devoted to any useful purpose.

To hold that these tin cans are cylindrical or tubular tanks or vessels for holding gas, liquids, or other material within the meaning of paragraph 151 would be attributing to Congress a lack of ordinary sense and to the words of the paragraph a meaning which we think it was never intended should attach thereto.

We find nothing in the Marx & Rawolle case to sustain the appellees' contention here.

It might well be added that the words cylindrical or tubular tanks or vessels in common use or understanding, we think, never relate or refer to such tin cans as those involved here. Who has ever heard in common speech of such a tin can being referred to as a tubular tank or vessel? Or what purchaser, in ordering tomatoes or tomato sauce, has ever in his order referred to them as contained in cylindrical or tubular tanks or vessels, thereby meaning such tin cans as these?

While it may not be easy to state with precision the exact application to be given in future cases to the words under consideration in paragraph 151, nor is it necessary for the determination of this case so to do, yet, in view of the apparent misunderstanding as to the meaning which may be attached to the term "cylindrical or tubular tanks or vessels for holding gas, liquids, or other material, whether full or empty," it may be observed that, consistent with our decision in the case of Marx & Rawolle and of this case, it would seem that such cylindrical or tubular tanks or vessels should be made in part at least of metal, should be of so strong and permanent a construction as to be adapted for use as holders or containers after the contents first imported have been removed, should possess some appreciable value for that or other purposes, and should also be so constructed that their character and usefulness as containers would not be destroyed by the act of removing therefrom the contents first imported therein.

While, of course, the precise determination of the question must always abide the particular facts of each case, yet such would seem to be the result of construing paragraph 151 with the provisions of subsection 18 of section 28, above quoted.

As previously enacted (see section 19 of the customs administrative act of June 10, 1890) this section did not contain a provision for including in the dutiable value of ad valorem goods, casks, barrels, hogsheads, bottles, jars, demijohns, carboys, and other containers of liquids.

In the case of United States v. Nichols (186 U. S., 298), the Supreme Court considered this section and held that the customs administrative act was not a tariff act; that the description of the containers therein found, which was cartons, cases, crates, boxes, sacks, and coverings of any kind, was limited to containers of solids, and intimated that the use of the words casks, barrels, hogsheads, bottles, demijohns, carboys, or words of similar signification should appear in the statute if it were sought to include in the dutiable value of liquids the containers thereof.

Congress, in enacting subsection 18, added the precise words and one other, "jars," which were embodied in the aforesaid intimation of the Supreme Court, thereby expressly indicating that so far as the containers of ad valorem goods at least are concerned there should be no distinction between the containers of liquids and the containers of solids (and it is manifest that semiliquids, which may describe the merchandise here, must fall within these two classes) and also expressly provided that—

If there be used for covering or holding imported merchandise, whether dutiable or free, any unusual article or form designed for use otherwise than in the bona fide transportation of such merchandise to the United States, additional duty shall be levied and collected upon such material or article at the rate to which the same would be subjected if separately imported.

The containers here, however, are the ordinary containers used for holding the merchandise transported therein. They are neither designed nor adapted to any other use nor of any value apart from their contents, and it having been found that they are not within the provisions of paragraph 151, duty is properly assessed thereon by including their value in that of their contents, as is provided in said subsection 18. They clearly are included in the words "other containers or coverings, whether holding liquids or solids," found therein. Such a conclusion gives full effect not only to paragraph 151, but also to subsection 18 under consideration.

It was evidently the intention of Congress to treat the value of the ordinary containers, at least of goods dutiable at ad valorem rates unless such containers were elsewhere so specifically provided for as to indicate a contrary intention, in the same manner as it treated the costs, charges, and expenses incident to placing the merchandise in condition, packed and ready for shipment, namely, as being included in the market value of the goods themselves in the principal markets

of the country from whence imported. It is obvious that they are bought and sold in this manner, and that all these charges, including the cost of the container, entered into their purchase price, and, therefore, for purposes of assessing duty, it is the logical and consistent way and manner to treat them.

Separated from their contents these containers are of no use, of no value, and do not constitute any part of the consideration which induces the purchase thereof by the consumers, and, ordinarily, they pass from the hands of the importers to the consumers, whose sole purpose and object is to obtain the contents and not the containers.

In addition to this, it is apparent that in the practical administration of the customs laws such a treatment of these containers contributes to rapidity and facility in the ascertainment and collection of revenue.

When containers, however, are unusual articles or forms designed for use otherwise than in the bona fide transportation of their contents to the United States, or when they are of such material use, form, shape, or value that Congress therefor or for any other reason has seen fit to apply a different rule thereto and impose additional duties thereon, clearly they are then subject to such rule and duties as are otherwise provided. That such is the scope of subsection 18 and that such is the construction to be placed thereon is plainly evidenced by the judicial interpretation which the immediate predecessor of said subsection 18 has already received in the Supreme Court. United States *v.* Nichols, *supra.*

The result is that the judgment of the Board of General Appraisers is *reversed.*