THOS. COOK & SON-WAGONS-LITS, INC. *v.* UNITED STATES (No. 4425)[1]

United States Court of Customs and Patent Appeals, June 10, 1943

*James W. Bevans* for appellant.

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

---

[1] C. A. D 245.

[Oral argument April 8, 1943, by Mr. Bevans and Mr. Donohue]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, LENROOT, and JACKSON, Associate Judges

BLAND, Judge, delivered the opinion of the court:

Subject to the Tariff Act of 1930, certain importations were made by the White Laboratories, Inc., of 260 drums containing cod-liver oil, which were classified and assessed with duty at 25 per centum ad valorem under paragraph 328 of said tariff act. The appellant herein, acting for said importer, protested the collector's action in so classifying and assessing duty upon said drums (the oil being free) and claimed that said merchandise as imported consisted of containers which were not reusable and that therefore said merchandise was not dutiable as assessed.

The United States Customs Court, Third Division, overruled appellant's protest, and from its judgment so doing appellant has here appealed.

Paragraph 328 of the Tariff Act of 1930 reads as follows:

PAR. 328. Lap-welded, butt-welded, seamed, or jointed iron or steel tubes, pipes, flues, and stays, not thinner than sixty-five one-thousandths of one inch, if not less than three-eighths of one inch in diameter, three-fourths of 1 cent per pound; if less than three-eighths and not less than one-fourth of one inch in diameter, 1¼ cents per pound; if less than one-fourth of one inch in diameter, 1¾ cents per pound: *Provided*, That no tubes, pipes, flues, or stays made of charcoal iron shall be subject to a less rate of duty than 1¼ cents per pound; *cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty;* welded cylindrical furnaces, tubes and flues made from plate metal, whether corrugated, ribbed, or otherwise reinforced against collapsing pressure, and all other finished or unfinished iron or steel tubes not specially provided for, *25 per centum ad valorem;* flexible metal tubing or hose, whether covered with wire or other material, including any appliances or attachments affixed thereto, not specially provided for, and rigid iron or steel tubes or pipes prepared and lined or coated in any manner suitable for use as conduits for electrical conductors, 30 per centum ad valorem. [Italics ours, except the word *Provided.*]

The testimony of three witnesses for the importer and five witnesses for the Government was heard by the trial court, and from the testimony we summarize the following proven facts: that the drums are of metal and are known as "single-trip containers" or "one-time shippers"; that they are made of light gauge (18-gauge) material and hold 55 gallons of liquid; that at one time in this country such imported drums were, for the most part, destroyed or used as scrap metal, but that later on, drums of the character here involved were purchased by drum reconditioning firms and were by them reconditioned and sold for further uses; that some firms which used the imported oil or other merchandise arriving in the 18-gauge, 55-gallon drums also at times reconditioned them for further use as containers for various kinds of merchandise; that the classification of drums into heavy drums and "single trip" containers was brought about largely by the considera-

tions of the danger from leakage of explosive, inflammable, or corrosive materials in transportation; that merchandise like that involved here on the date of importation and for a considerable period prior thereto was useful as drums for the transportation and importation of merchandise and, for the most part, was so utilized, although a smaller portion of the same, owing to unreclaimable condition, was fit only for use as scrap metal; that those who reconditioned drums like those at bar at one time paid nothing for them, but that, at the time of the instant importation they paid, depending upon the condition of the same, from 15 cents to $1 per drum, and that if the drums were purchased for junk, the price ranged from 15 cents to 45 cents per hundred pounds; that in some instances the heads of the drums were mutilated by the use of an ax in an effort to make the drums not reusable as such, but that such drums, however, were frequently reconditioned by welding a spot over the mutilated portion and used again as drums and not as scrap metal (while some of the drums which were mutilated may have been sold for scrap, the percentage of the drums falling within this class is not disclosed); that some of the reconditioners divided their purchases of such used drums into three classes and paid according to the condition and classification; that the number 1 drums of the weight and capacity of those herein imported had to be free and clean of moisture and other foreign materials and were painted a particular color and used, for the most part, for lubricating oils; that the number 2 drums were used for certain inferior grades of lubricating oils and oils with nonasphaltic base; that the number 3 drums were used for semisolid asphalts; that such reconditioned drums of all the classes were used for exporting merchandise to many different foreign ports; that the reconditioners of the drums, according to the universal practice observed after purchase and before resale, were required to process them through certain steps to prepare them for their further use; that the first step was a de-denting process done by hydrostatic pressure; that in this process the dents, if any appeared, were removed; that special machinery was provided for this purpose; that the second step was to clean the drums internally by placing them over jets through which was forced a hot alkaline solution; that the third step was the placing of the drums on rollers, on which they were rolled around to remove the rust from the inside, and an acid was used to prevent re-rusting; that the fourth step was to dry the drums with the use of a blower which evaporated the moisture; that the fifth step was to test, by air pressure, to discover leaks and thereafter the leaky portions were welded and pressure was then applied with the use of soapy water to determine whether any leaks remained; that the sixth step was to paint the exterior of the drums, or at least a portion thereof, and bake the painted drums in an oven.

It is appellant's contention that the drums were the regular containers of the imported merchandise and that as imported they were unfit for reuse as containers for "holding gas, liquids, or other material" and that said processes enumerated above, which prepare them for re-use, are in the nature of a remanufacture, and that, as imported, said drums were fit only for remanufacture; that in any event the importer could not use the drums in the condition imported for holding merchandise unless he had available elaborate machinery for applying said processes of reconditioning.

Appellant further contends that the case of *United States* v. *Garramone*, 2 Ct. Cust. Appls. 30, T. D. 31577, is controlling of decision here, while the Government contends that said case has no bearing on the instant issue since in that case, as in the case of *C. L. Huisking & Co., Inc.* v. *United States*, T. D. 45017, 60 Treas. Dec. 74, also relied upon by appellant, the imported merchandise, after one shipment, was sent to the scrap pile.

The Government, in support of the judgment appealed from, relies largely upon the decisions of this court in *Balfour, Guthrie & Co., Ltd.* v. *United States*, 27 C. C. P. A. (Customs) 17, C. A. D. 55, and in *United States* v. *Bene et al.*, 6 Ct. Cust. Appls. 523, T. D. 36145.

We are in agreement with the conclusion reached by the trial court. We think Congress, in the enactment of paragraph 328, *supra*, intended to make dutiable, vessels like those at bar which were capable of reuse as containers for holding the material specified in the provision, although the reuse of such containers, in many instances, was not commercially practicable until they had been reconditioned by processes like those shown to have been applied to the instant drums. It obviously sought to protect manufacturers of similar products in the United States, and the provision was made that they were dutiable "whether full or empty." If they were full, they would necessarily require cleansing before reuse.

In *Marx & Rawolle et al.* v. *United States*, 3 Ct. Cust. Appls. 94, T. D. 32359, cited by the Government, the contention was made that iron drums, which were used as the usual containers for crude glycerin, were not dutiable for the reason that the provision did not relate to "usual containers which were used for the bona fide transportation of goods but only applied to containers used for purposes other than the transportation of their contents." The importer's position there was not sustained. It was there pointed out that although they were the usual containers of the merchandise imported, they nevertheless "survive that use, and become or rather remain useful and valuable articles of commerce. After they are emptied of their contents as imported, some are used again in the transportation of crude or refined glycerin; some are sold in competition with similar articles in the domestic market," citing the *Garramone* case,

*supra*, and *United States* v. *Braun Chemical Co.*, 2 Ct. Cust. Appls. 57, T. D. 31596, as authorities.

In the *Bene* case, *supra*, the *Garramone* and *Braun Chemical Co.* cases were cited, and drums strongly built of sheet iron, which were "available for further use as receptacles" were held dutiable under paragraph 127 of the Tariff Act of 1913, which, in respects material here, is substantially the same as paragraph 328 of the Tariff Act of 1930.

The latest expression of this court upon the subject is to be found in the *Balfour, Guthrie* case, *supra*, where the same statutory provision now under consideration was construed and applied with reference to merchandise which was regarded as the usual, ordinary, and necessary containers of palm oil. It was there stated that, as far as that record was concerned, the imported drums were "capable of continued use in the commerce of the United States" and that upon the authority of *Colby* v. *United States*, 3 Ct. Cust. Appls. 234, T. D. 32542, they were dutiable under said paragraph 328, *supra*.

In the *Colby* case we find the following:

\* \* \*. In that case [referring to *United States* v. *Braun*, supra] it appeared that the containers involved were necessarily destroyed as containers in the process of removing their contents. In the present case the containers are capable of continued use, but are old and dented, and are therefore not readily salable. But the record does not justify a holding that they no longer have any value at all as containers, especially in view of the finding of the appraiser.

We see no distinction to be made between the merchandise under consideration there and the merchandise at bar. The instant drums admittedly compete not only in domestic commercial transactions but also with the use of domestic products in international commerce. The mere fact that considerable work and expense must be applied before they are salable or usable again as containers for holding merchandise like that provided for in the paragraph in question is not a matter of concern here. If the amount of work required in the reconditioning of the drums (as long as they always remained drums) were to be regarded as controlling here, it would be difficult to draw the line of demarcation between much or little work so done.

For the reasons stated, the judgment of the United States Customs Court is *affirmed*.