(C. D. 1077)

C. J. TOWER & SONS *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 5, 1948)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett* and *William J. Vitale,* special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

JOHNSON, Judge: This action was brought by protest against the legality of the collector's assessment of duty at the rate of 25 per centum ad valorem under paragraph 328 of the Tariff Act of 1930, upon 455 metal drums, each imported as a container of 220 pounds of calcium carbide which is subject to duty at a specific rate. The plaintiff claims that the drums are the usual coverings of specific-

duty goods and therefore entitled to free entry, or that they are free of duty under paragraph 1615, as amended, as American goods returned. By way of amendment of the protest, further claim is made that the imposition of duty upon calcium carbide drums is contrary to a long-continued administrative practice and in violation of section 6 of the Customs Administrative Act of 1938. Section 6, *supra*, amends section 315 of the Tariff Act of 1930 by adding thereto the following:

Insofar as duties are based upon the quantity of any merchandise, such duties shall, except as provided in paragraph 813 and section 562 of this Act (relating respectively to certain beverages and to manipulating warehouses), be levied and collected upon the quantity of such merchandise at the time of its importation. No administrative ruling resulting in the imposition of a higher rate of duty or charge than the Secretary of the Treasury shall find to have been applicable to imported merchandise under an established and uniform practice shall be effective with respect to articles entered for consumption or withdrawn from warehouse for consumption prior to the expiration of thirty days after the date of publication in the weekly Treasury Decisions of notice of such ruling; but this provision shall not apply with respect to the imposition of antidumping duties.

In the collector's letter of transmittal of the protest to this court "factual inquiries" were given as reasons for the assessment of duty upon the drums. It appears from the evidence herein that containers of calcium carbide have been admitted free of duty as the usual containers of specific-duty merchandise since 1919 upon the theory that they were incapable of continued use after having been emptied of their contents. If the collector, through investigation, had concluded to his satisfaction that the imported drums are not only capable of use but actually are used after the removal of their contents, it would be unnecessary to withhold his assessment of duty until the Secretary of the Treasury published in the TREASURY DECISIONS a notification of a change in practice. In such circumstances, a change in practice was not made dependable upon administrative ruling but rather it was the result of the collector's finding that the containers survive their initial use and come within the dutiable provisions of paragraph 328. See *Gellman Bros.* v. *United States*, 13 Cust. Ct. 252, Abstract 49591. There, the court held that even though merchandise had been erroneously classified for many years, such classification may be changed upon discovery of the error without publication of notice to that effect, in accordance with section 6, *supra*. That claim, therefore, will not be further considered. At the trial counsel for the plaintiff abandoned the claim that the merchandise was free of duty as American drums returned from abroad.

The only question remaining is whether the drums involved in the case are of such character and in such condition as would exempt them from duty as assessed by the collector. In the case of *Gash* v. *United States*, 68 Treas. Dec. 297, T. D. 47890, the court set out the tests

applicable in order to ascertain whether iron drum containers should be held dutiable at the same rate as their contents, or entitled to free entry when containing duty-free or specific-duty merchandise, as follows:

First, whether the drums at the time of arrival in the United States were in such condition that their commercial value as containers, after the removal of their contents, was precluded, and they did not in fact enter the commerce of the United States in competition with other containers. *American Shipping Co.* v. *United States*, T. D. 43316; *Squibb* v. *United States*, Abstract 4409.

Second, whether the condition of their contents was such that it was the general commercial practice to destroy the containers as coverings in the removal thereof, *Harshaw, Fuller & Goodwin Co.* v. *United States*, Abstract 16880; *Mailliard & Schmiedell* v. *United States*, Abstract 8550; *Columbia Naval Stores Co.* v. *United States*, Abstract 6925.

Third, whether the nature of their contents precluded their further use commercially as containers. *Huisking* v. *United States*, T. D. 45017.

Three witnesses appeared on behalf of the plaintiff, two of which offered testimony, an attorney for the Union Carbide and Carbon Corp., Stanley Williamson, who was in charge of the customs matters for the company since 1920, and James J. Robinson, superintendent of the Prest-O-Lite Co. plant in Buffalo. The Government offered no evidence.

The first witness, Williamson, testified that the Prest-O-Lite Co., the ultimate consignee of the imported drums and the calcium carbide contents, was one of the units of the Union Carbide and Carbon Corp. The Union Carbide and Carbon Corp., in its plants throughout the United States, manufactures calcium carbide, and it is never imported except by such of the units of the company as have foreign plants. The Prest-O-Lite Corp. is a consumer of calcium carbide in its manufacture of acetylene gas. All of the manufacturers of calcium carbide and of acetylene gas in the United States, as well as manufacturers of welding and cutting utensils, which use acetylene gas and oxygen, belong to the International Acetylene. The witness attends to all the customs matters which pertain to carbon carbide drums for the members of the International Acetylene and is thoroughly familiar with the disposition of the drums containing calcium carbide used by plants in this country.

In 1920, according to the witness he made a survey particularly to ascertain the condition and ultimate disposition of calcium carbide drums, and another one in 1931. In these surveys he took many pictures showing the condition of the drums after importation and their condition after being emptied of their contents. Up to the time duty was assessed upon the drums involved herein, the witness stated the calcium carbide drums had been admitted without the imposition of duty. In the year 1942, the witness stated he received a telephone call from a Mr. Neustadt, who was in the office of the supervising customs agent in New York, advising that he wanted the witness to

visit the various plants with Customs Agent Christides for an inspection of calcium carbide drums. The reason given the witness was that an investigation was being made with the view of assessing duty upon such drums. The witness further testified that "We went around the different plants and I showed him the carbide drums and told him how to find others and gave him pictures and then he made his own investigation." (Record pp. 19/20.)

The same witness testified that calcium carbide, when mixed with water, forms acetylene gas. Moreover, this gas, when in a confined space, if ignited by means of a spark or an open flame, is very explosive. Witness further stated that as the material in texture is extremely fine it therefore has a tendency to collect in the cracks and crevices of drums and, unless the containers are entirely emptied, or if carelessly handled, there is serious danger of explosion. In fact, he declared that the hazard of explosion is so great that reused drums are prohibited by law from being carried on canals or steamboats.

The witness further testified that during the war, the War Production Board requested all manufacturers and users of steel, including his company, to conserve it as much as possible, and thus the question arose as to the possible reuse of iron or steel drums. Consequently, when calcium carbide was shipped, its various plants were ordered to return the drums. It was found, however, according to the witness, that the users of the calcium carbide would invariably leave some of the material in the drums; that because of pockets of calcium carbide residue in same, the likelihood of an explosion was intensified; that after the drums were returned to the plant, examination thereof disclosed at least 70 per centum would have to be rejected as unsuitable for further use on account of holes in the drums; and that as a result of conforming to the request of the War Production Board every drum the company had attempted to save was ordered scrapped and remelted for steel purposes. Therefore, the witness stated, all of its plants were notified not to attempt to salvage any more of the empty calcium drums for reuse.

Within the experience of witness, it has been the practice, in order to empty the drums, to cut off the tops; that when sold, the empty drums were open on one end and could be used only as receptacles for tar and pitch, or for holding a floor-sweeping compound in factories, and in such condition they definitely were not usable in the transportation of merchandise as iron drum containers.

The second witness, Robinson, testified in substance that he was able to recall the 455 drums he received from Canada containing calcium carbide for the reason that they were the only 220-pound drums the company had ever received. The usual drum received at the Prest-O-Lite plant, according to witness, weighed 600 pounds. The drums in question, he said, were emptied of their contents by removing

the heads and then "up-ending" each drum and emptying the calcium carbide into a chute; that the drums when received were badly dented and the seams were damaged.

When asked about the element of hazard in the use of second-hand calcium carbide drums, this witness stated that if air or moisture enters calcium carbide drums, a gas is generated from contact with the calcium carbide; that if sufficient gas accumulates to blow out the head, in the separation, enough friction would be generated to cause ignition of the gas and consequent explosion.

The heads of the drums in question, according to the witness, were removed by means of a nonsparking metal tool which is jabbed into the center of the lid and brought down around the edge, thus cutting out the lid much as the top is cut from a tin can with a can opener; and that heads removed in such a manner cannot be soldered back on the drums. The witness stated that friction lids are very difficult to remove from calcium carbide drums because moisture is attracted to the substance, thus causing the lids to corrode, and that such drums with screw lids are also very difficult to remove for the same reason.

And finally, the witness testified that the drums in question were actually sold as scrap metal to Hurwitz Bros. Iron & Metal Co. of Buffalo, dealers in scrap metal and not in second-hand drums.

From a careful consideration of the aforesaid evidence, all of which is uncontradicted, it is abundantly clear that the commercial value of the drums as containers, after the removal of their contents, was precluded because of the general practice prevailing to cut out the heads in order to empty them. Without heads, the drums were not in condition to enter the commerce of the United States in competition with other drums as containers of merchandise. The evidence is also uncontradicted that the nature of the contents definitely precluded further use of the drums as containers; that it would have been extremely dangerous to attempt to do so; and that these particular drums were, in fact, sold for scrap steel purposes.

The contention of the Government that the collector correctly classified the merchandise merely because the drums might be suitable for use as containers of scrap obviously does not bring the same within the definition of the tariff provision in paragraph 328 for "cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty." By no stretch of the imagination can it be said that Congress so intended articles in such condition to come under or within the aforesaid provision of the tariff act, nor do the courts sustain such view.

In *United States* v. *Garramone*, 2 Ct. Cust. Appls. 30, T. D. 31577, the Court of Customs Appeals, now the Court of Customs and Patent Appeals, stated, as to the interpretation of a correlative paragraph

[151] in the Tariff Act of 1909, to paragraph 328, Tariff Act of 1930, as follows:

\* \* \* in view of the apparent misunderstanding as to the meaning which may be attached to the term "cylindrical or tubular tanks or vessels for holding gas, liquids, or other material, whether full or empty," it may be observed that, consistent with our decision in the case of Marx & Rawolle [1 Ct. Cust. Appls. 152, T. D. 31210] and of this case, it would seem that such cylindrical or tubular tanks or vessels should be made in part at least of metal, should be of so strong and permanent a construction as to be adapted for use as holders or containers after the contents first imported have been removed, should possess some appreciable value for that or other purposes, and should also be so constructed that their character and usefulness as containers would not be destroyed by the act of removing therefrom the contents first imported therein.

In the case of *Philipp Bros., Inc.* v. *United States*, 12 Cust. Ct. 266, Abstract 49239, this court stated:

\* \* \* The fact that the junk dealer was able to use some of the drums for the purpose of shipping them filled with other junk to another junk dealer is not sufficient to establish that such headless, and otherwise damaged drums were capable of competing with American made drums for the transportation of such merchandise as is usually transported in iron drums.

Although duty was assessed upon these drums by the collector as the alleged result of "factual inquiries" by customs officers, it is significant that no evidence was produced to substantiate the assessment.

For the reasons stated, judgment will be entered in favor of the plaintiff directing the collector to reliquidate the entry and make refund of all duties taken, in accordance with law.