UNITED STATES *v.* C. J. TOWER & SONS (No. 4594)[1]

---

[1] C. A. D. 406.

United States Court of Customs and Patent Appeals, March 7, 1949

*David N. Edelstein*, Assistant Attorney General (*Charles J. Miville*, Acting Head of Customs Division, and *Richard F. Weeks*, special attorney, of counsel), for the United States.

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for appellee.

[Oral argument February 1, 1949, by Mr. Weeks and Mr. Schwartz]

Before GARRETT, Chief Judge, and HATFIELD, JACKSON, O'CONNELL, and JOHNSON, Associate Judges

O'CONNELL, Judge, delivered the opinion of the court:

This is an appeal from the judgment of the United States Customs Court, Third Division, rendered in conformity with its decision, C. D. 1077, sustaining the protest of the importer, appellee, in which it was claimed, among other things, that 455 steel drums, imported as containers of calcium carbide, were entitled to entry free of duty as the usual containers of merchandise dutiable by weight, sometimes called "specific-duty merchandise," rather than as cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, as assessed by the collector at the port of Buffalo at 25 per centum ad valorem, in accordance with the provisions of paragraph 328 of the Tariff Act of 1930.

The importation was consigned and delivered to the Prest-O-Lite Company of Buffalo, a unit of Union Carbide & Carbon Corporation, and was exported by Shawinigan Chemicals, Ltd., of Montreal. Each of the imported drums contained 220 pounds of calcium carbide.

Appellee's protest was amended to include the claim that the involved assessment was contrary to a long-established administrative practice requiring a thirty-day notice of change. That claim was overruled by the trial court and the correctness of such ruling has not been questioned in the appeal to this court. The calcium carbide was assessed with duty at one cent per pound under paragraph 16 of the Tariff Act of 1930, and the correctness of such classification and assessment is likewise not disputed here.

Paragraph 328 of the Tariff Act of 1930, so far as pertinent, reads:

PAR. 328. * * * cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, whether full or empty; * * * and all other finished or unfinished iron or steel tubes not specially provided for, 25 per centum ad valorem * * *.

The witnesses who testified were called by appellee; namely, Stanley Williamson, a member of the customs bar representing the Union Carbide and Carbon Corporation, and James J. Robinson, superintendent of the plant of the Prest-O-Lite Company, who was in charge

of all the operations of the plant, including the disposition of all calcium carbide drums.

The witness Williamson testified extensively on the issue which is no longer in controversy; namely, an administrative practice of classifying calcium carbide drums. He was not familiar with the specific importation of the drums in the instant case.

The witness Robinson recalled the receipt of the 455 drums in question because the size of the drums was unusual, being the only 220-pound drums ever received at the plant. Those particular drums, he stated, differed from other calcium carbide drums, in that they all had a top that screwed into place; that in some cases the tops of those drums were unscrewed with a monkey wrench, but in many cases it was impossible to unscrew them, and the drums had to be pried open with a non-sparking tool. The record discloses that the witness Robinson was interrogated on cross-examination and responded as follows:

XQ. Well, how many of those drums did you unscrew instead of prying them open?—A. I don't remember.

The witness Robinson further testified that if a calcium carbide drum is not air-tight or has any cracks in it, or if the top of the drum has been damaged "where it's open," the drum is not considered safe for refilling with calcium carbide. With respect to the condition of the involved drums on their arrival at the Prest-O-Lite plant, and with respect to other matters pertinent to the question here in issue, the further cross-examination of the witness Robinson discloses the following facts.

XQ. You stated that this particular shipment was badly damaged; is that right?—A. That's correct.

XQ. And was it your statement that the damage was due to the shifting during transportation?—A. That is part of the reason or the cause for it. That would be my opinion.

XQ. They were in an unusually damaged condition; is that right?—A. No; I wouldn't say so.

XQ. Is it usual for them to shift during transportation?—A. In many cases they do.

XQ. Do you know whether the carbide contents eat into the metal or damage the metal on the inside of the drum?—A. No; I don't think so.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

XQ. When did you empty the drums?—A. Between the date of receipt and March 1, 1943.

XQ. Did you empty them all at one time or gradually?—A. Oh, no; we have to use so many in each charge and so many charges a day. It depends on the demands of the day.

XQ. Isn't it a fact that you stored these drums in your plant until you received instructions as to what to do with them?—A. Those drums—I can't recall that.

XQ. Did you receive any instructions? Did you seek instructions as to what to do with them?—A. We received instructions to scrap them.

XQ. From whom?—A. From our New York office.

XQ. And did you request those instructions?—A. No, no; they happened to come in just about the time the drums were emptied.

XQ. How did the New York office know you had the drums?—A. Well, our requirements dictate that we order them through our New York office.

XQ. Did you report the drums to the New York office?—A. Oh, yes.

XQ. Do you report all drums to the New York office?—A. Yes.

XQ. When you say you disposed of them as scrap, you mean you sold them to a scrap dealer?—A. That's correct.

XQ. Well, wouldn't you do that without instructions?—A. Well, it's just like every other institution. We have our instructions covering various phases of plant operations. We have many plants and those instructions are generally standardized.

The witness Robinson further testified that the drums here involved, when emptied, together with other scrap material were sold to Hurwitz Bros. Iron Metal Company at $12 a net ton, as "5 Loads SCRAP IRON (old drums, lids, etc.)."

The following fact with respect to the disposition of the 455 empty drums was brought out on re-cross-examination by counsel for the Government:

R. D. Q. Mr. Witness, did you crush these 220-pound drums before you shipped them to the Hurwitz Company?—A. No; we mutilated them with a hand axe.

The Congress in the enactment of paragraph 328, *supra*, whereby cylindrical and tubular tanks or vessels, for holding gas, liquids, or other material, were made dutiable, whether full or empty when imported, obviously sought to protect the American manufacturer of such containers. *Thos. Cook & Son-Wagons-Lits, Inc.* v. *United States*, 31 C. C. P. A. (Customs) 32, C. A. D. 245. The court pointed out in the case of *United States* v. *Marx*, 1 Ct. Cust. Appls. 152, 154, T. D. 31210, that not only were cylindrical and tubular tanks or other vessels for holding gas or liquids dutiable under an identical provision in paragraph 151 of the tariff act of 1909, but also that such provision included all vessels of a similar character for holding any other material.

Imported metal containers were dutiable under paragraph 151 of the tariff act of 1909, except where it appeared from the evidence thay they were the ordinary, usual, and necessary containers for the merchandise contained in them; that they had no use or purpose otherwise than in the bona fide transportation of such merchandise to the United States; and that in the removal of the contents the containers were destroyed and had no further value as such containers. *United States* v. *Garramone*, 2 Ct. Cust. Appls. 30, T. D. 31577; *United States* v. *Braun Chemical Co.*, 2 Ct. Cust. Appls. 57, T. D. 31596. See also *Balfour, Guthrie & Co., Ltd.* v. *United States*, 27 C. C. P. A. (Customs) 17, C. A. D. 55.

Under paragraph 127 of the tariff act of 1913, the provisions of which are substantially the same as the involved provisions of paragraph 328, *supra*, this court held that imported iron drums were prop-

erly classified and assessed with duty where it appeared from the evidence that such drums when emptied of their contents were neither destroyed nor reduced to rubbish but had some merchantable value for continued use in the commerce of the United States as receptacles for holding material. *United States* v. *Bene et al.*, 6 Ct. Cust. Appls. 523, T. D. 36145.

The plain inference to be drawn from the evidence hereinbefore set forth is that those drums, the contents of which could be and were emptied by merely unscrewing the tops of the drums and upending them, were capable of reuse in commerce, or might be, if necessity required it, reconditioned for such reuse, as containers for the materials specified in paragraph 328, *supra*, were it not that all the drums, when emptied, were mutilated with an axe and holes punched in them, in accordance with the general policy of the corporation. That conclusion is supported, at least to some extent, by the fact that the drums here in question were stored for a considerable period of time after the merchandise was received, depending "on the demands of the day."

Appellee had the burden to overcome the presumption of the correctness of the collector's finding. *Colby & Co.* v. *United States*, 3 Ct. Cust. Appls. 234, T. D. 32542; *United States* v. *Murphy & Co.*, 9 Ct. Cust. Appls. 248, T. D. 38206. It appears from the record that some of the involved drums were damaged in the removal of their contents and that others were not so damaged. To what extent such drums were not damaged does not appear of record. As hereinbefore noted, the witness Robinson, who is the only one who knew and testified concerning the disposition of the drums, was unable to state how many drums could be emptied without damage or how many were damaged at all when their contents were removed. Therefore, the court has no way of differentiating between the number of damaged drums and those not so damaged.

Under the circumstances, we are unable to hold that the trial court was right in sustaining appellee's protest and holding that all of the drums were damaged during the process of removing their contents therefrom. Accordingly, for the reasons hereinbefore stated, we are unable to agree with the views expressed by the court below that the appellee had sustained the burden of overcoming the presumption of correctness attending the collector's classification.

For the reasons stated, the judgment of the United States Customs Court is *reversed.*

JACKSON, Judge, dissenting:

If the record were merely what has been set out in the majority opinion, I could not disagree, but in my opinion the record does not justify the conclusion reached by the majority. While the witness Williamson testified at length with respect to long continued administrative practice, it appears from his testimony that since 1919 all the

importing and exporting business of the Union Carbide Company, of which Prest-O-Lite Company of Buffalo is a subsidiary company or "unit," was under his direct administration and supervision.

It appears from the testimony of that witness that from 1920 up to the time of the present importation all containers of calcium carbide were admitted free of duty.

He testified that he knew the type of drum here involved; that "I am testifying to all carbide drums"; and that such containers were unfit for reuse because of the nature of their contents which he described as follows:

Calcium carbide—there's a sample over there—when its mixed with water makes acetylene gas. Acetylene gas, if ignited by a spark or by an open flame in a confined space, is very explosive; it's like dynamite. There's nothing more deadly. Therefore, we try, in handling carbide, to keep it away from water and to keep it away from a spark. Now, the reason that we handle carbide drums so delicately and don't ship them for reuse again is because the carbide is fine, gets in the cracks of the drums, and if they aren't absolutely emptied, if they're carelessly handled the second person might get ahold of them and cause an explosion. It's such a hazardous thing that reused drums are prohibited from being carried on canals or steamboats or any water.

In answering the question by Judge LAWRENCE, "Prohibited by whom?" the witness said, "By law."

The witness showed his familiarity with the different types of drums, with respect to the structure of a 100 pound calcium carbide drum while under cross examination, as appears in the answers to the following question, "Have you ever seen any with a different (from the 100 pound drum) type of top?" by answering, "Yes. There's one— those of 100 pounds have that type of head. The larger ones have a screw head all round. It doesn't have that central plug. The whole top screws off." It is true that the witness stated that he had never seen a 220 pound drum, but that probably was because the present importation was the first in which calcium carbide was shipped in those drums.

From the following testimony of Mr. Williamson, it is proper to conclude that no calcium carbide containers of any size had ever been reused and were incapable of reuse.

This is my recollection. This question of reuse of carbide drums would never have come up except that *we wanted to conserve steel* and the War Production Board (in 1943) asked all manufacturers and users of steel to try to conserve it and *we were one of them.* The Shawinigan was one of them. When we got carbide drums in, therefore, we never reused them before under any condition— that is for the holding of carbide—since I came in the company in 1919. We tried to reuse them. *We tried to reuse the drums to save steel* and we *ordered our plants to try to use them and save steel.* We found that *it was very unsafe,* that the people to whom we shipped the drums would leave carbide in it [sic] like that and that they'd form pockets and you might have an explosion, that it took a long while to examine the drums in the plant, that is to take a drum like that and clean it out in the plant of the user, to load it on freight cars and ship it back to us and for us to inspect it. Now, when the drums came back to us we took them in the

dark room and we put a flashlight in the drum and we had a man hold the flashlight and the man on the outside looked and saw if there was any light going through, and we found out that the drums that had been *returned to us*, say, seventy percent were rejected; no use at all, couldn't do anything except scrap. Now, *we weren't conserving manpower by using all this.* We were taking up freight car space. So we issued an order not to use drums a second time under any consideration, and as a result of that order every drum that *we've been trying to save in the plant in the reuse was scrapped* and sold for junk. I don't mean sold for junk to be thrown away, but I mean the junkman would bale it up and it would be remelted for steel.

Then the witness further stated that calcium carbide containers were "absolutely unsafe to be used."

The witness Robinson had been connected at the time of testifying with the Prest-O-Lite Company as superintendent of the Buffalo plant for about 15 years. He was familiar with the instant importations and stated that the 220 pound containers were the only ones his company had received. He testified that after the contents of the involved drums had been removed, the drums were disposed of under his supervision by being mutilated and sold as scrap. After the carbide had been removed from them, the drums were "badly dented and damaged. The seams were damaged" and they were "considered unfit for further service." The witness testified as to the peculiar nature of calcium carbide, just as did the witness Williamson.

The involved drums, after having been mutilated and scrapped, were sold to a junkman for $12 per ton. "There were a few retained by employees for ash containers or garbage containers, and there were some used around the plant for receptacles; refuse receptacles."

Mr. Robinson testified that in opening the containers "A tool (Monel metal) is jabbed into the center of the lid and it's brought over and pressed down on the surface of it and it's brought around the edge of the drum and the drum head or lid cut out like you would with a can opener in the kitchen." Monel metal was used as it is a non sparking material. The witness knew of no machine that had been used in resealing the drums and stated that no drums were returned to Shawinigan, the exporter. He testified that the drum head had been reattached to 600 pound size drums by a "clamping device." Those drums, however, are not the drums here in issue. He stated, as did the witness Williamson, that the 220 pound drums had a top that screwed into place and in some cases the tops could be unscrewed, but in many cases they had to be opened with the instrument, hereinbefore mentioned.

The witness stated he could not remember how many of the drums were unscrewed, instead of being opened by cutting, and that when the tops were unscrewed a monkey wrench was used. The witness further stated that the screw top covered the entire head of the drum but that "there was some body between the lid itself and the side of the drum;" and when asked to explain that answer he stated as fol-

lows: "Well, there was an area, part of the drum itself, between the movable top and the side of the drum, similar to what you have there. * * * A sort of a lip between the center and the edge of the drum." That clearly indicates to me that not only had the imported drums a screw detachable head, but that underneath the head there was a covering to protect the contents. The witness testified that the drums in this shipment were badly damaged, but not in an unusual fashion.

Mr. Robinson testified that the involved drums were at the plant of his company between the entry of the shipment, December 16, 1942, until the date of the bill of lading of the junkman, March 1, 1943. The witness did not state that the drums were "stored." That expression was in the cross question propounded to him. He stated that his company had received instructions to scrap the drums; that all drums were reported to the New York office; and that such instructions were generally standardized.

The witness Robinson stated emphatically that the Shawinigan drums were never disposed of otherwise than by junking, but the drums of the 600-pound style were disposed of otherwise. The witness definitely stated as far as his experience went, and that has obviously been long, that no calcium carbide drum had ever been reused for the transportation of merchandise after its contents had been emptied. It is true that he stated, "No; not that I know of," with respect to such reuse. But it is only fair to the witness to conclude that if any calcium carbide drum had ever been reused, he certainly would have known of it. It would have been his business to do so.

With that record before it, the trial court in my opinion quite properly held that, "The evidence is also uncontradicted that the nature of the contents definitely precluded further use of the drums as containers; that it would have been extremely dangerous to attempt to do so; and that these particular drums were, in fact, sold for scrap steel purposes."

There is no doubt in my mind but that the plaintiff established a *prima facie* case. Evidently counsel for the Government also must have been of that opinion, because no motion was made to dismiss the protest on the ground that the proof was insufficient to overcome the presumption of correctness attaching to the collector's finding. In that situation, particularly in view of the fact that in the report of the collector, it is stated that the basis of his affirming his original classification was "factual inquiries," surely if appellee had established a *prima facie* case, and in my opinion it did, it was the duty of the Government in the interest of justice to substantiate by evidence the results of the "factual inquiries."

For the reasons herein given, in my opinion, the judgment of the United States Customs Court should be affirmed.